**STATE of Missouri, Respondent,**

v.

**Leonard S. TAYLOR, Appellants.**

No. SC 89294.

Supreme Court of Missouri,
En Banc.

Oct. 27, 2009.

Rehearing Denied Dec. 22, 2009.

Rosemary E. Percival, Office of the State Public Defender, Kansas City, MO, for appellants.

Chris Koster, Attorney General, Evan J. Buchheim, Shaun J. Mackelprang, Office of Missouri Attorney General, Jefferson City, MO, for respondent.

WILLIAM RAY PRICE, JR., Chief Justice.

## I. Introduction

A jury found Leonard Taylor guilty of four counts of first degree murder pursuant to section 565.020[1] for killing Angela Rowe and her three children. The jury recommended and the trial court sentenced Taylor to death. This Court has exclusive jurisdiction. Mo. Const. art. V, sec. 3. The judgment is affirmed.

## II. Facts

On December 3, 2004, police discovered the bodies of Angela Rowe and her three children in Rowe's home. The police found that the house was locked and gained entry through a bedroom window. Inside, the air conditioner was set at fifty degrees and a television was on. Outside, newspapers were in the front yard and mail was in the mailbox.

The victims died from gunshots from a .38 or .357 revolver. An autopsy revealed that Rowe had sustained four gunshots: two to her left arm, one to her chest, and one fatal shot to her head. Alexus Conley, ten years old, and Acqreya Conley, six years old, sustained two fatal gunshots to the head, and Tyrese Conley, five years old, sustained one fatal gunshot wound to the head. The victims' bodies were in the early stages of decomposition but past the state of rigor moris. The medical examiner determined the victims had been deceased for two to three weeks.

Taylor was dating Rowe at the time of her death. He also was married to Debrene Williams, who lived in California. On November 23rd, 2004, Taylor called his brother Perry Taylor (Perry) asking for money. Taylor told him:

> I killed Angela.... I didn't mean to kill her, ... but she came at me with a knife and I couldn't get her off of me.... I shot her two or three times.

Taylor also told his brother "I'm going to kill the kids too" or "I killed the kids." Telephone records show Taylor called Perry from his cell phone on November 23rd at 11:24 p.m. and on November 24th at 12:05 a.m. Telephone records also show that Rowe's landline was used to call Per-

---

1. All statutory references are to RSMo 2000, unless otherwise noted.

ry's cell phone twice in the afternoon of November 24th.

On November 24th or 25th, Perry told his girlfriend that Taylor "killed Angie and the kids." On November 25th, Perry was at his girlfriend's house when he received a call from Taylor. Perry told his girlfriend Taylor was still at Rowe's house "waiting on a letter to come from California." The girlfriend heard Perry ask Taylor, "how you there with them people? They dead." Perry told her that Taylor had "turned off the heat and turned on the air conditioning, and the bitch wouldn't let him go." Taylor's cell phone records show four calls to Perry on November 25th and Rowe's landline records show one call to Perry that same day.

Taylor left St. Louis on November 26th. He had plane tickets from St. Louis to Ontario, California, via Phoenix, Arizona. The reservation was made on November 25th by "Deb" and was made from a telephone number with a California area code.[2] The ticket was under the name "Louis Bradley," a name Taylor used as an alias and the name on a Missouri identification with Taylor's picture. Early on November 26th, Taylor went to his sister-in-law's home for a ride to the airport. Taylor was seen disposing of a pistol in the sewer near the house, though it was never recovered. Taylor also left Perry's vehicle and a box for Perry at his sister-in-law's house. On the way to the airport, Taylor told his sister-in-law:

> This will probably be the last time you see me alive. I need to get out of St. Louis, some people are trying to kill me. And you're going to hear some things about me that are not true, don't believe them . . .

Taylor was in California with his wife on November 27th. On December 3rd, Taylor made several calls from his cell phone, and the repoll number was from Columbus, Georgia.

Taylor was arrested on December 9th in Madisonville, Kentucky, at the home of another girlfriend. Police had the house under surveillance and observed Taylor leaving by lying on the floorboard of a vehicle. At the time of his arrest, Taylor used the alias "Jason Lovely."

As of December 3rd, the victims had not been seen for several days. Rowe did not report to her weekend shift as a housekeeper on November 21st, but she had called in to report her absence. She also missed work on November 26th, 27th, and 28th and did not call in to report her absence on these days. Rowe's children were absent from school the entire week of November 29th, when classes resumed from the Thanksgiving break.

The last time family and friends remember talking to or seeing the victims is unclear. The telephone records from Rowe's landline show that the last outgoing call was placed on November 25th. From November 1st to 25th, the number of outgoing calls ranged from four to seventy-two. Taylor's cell phone records do not show any calls to Rowe after November 23rd. Two non-functioning cell phones were found in Rowe's home, and there was no evidence Rowe had any other functioning cell phone.

Rowe's friend testified she last spoke to Rowe on November 22nd and called Rowe's house repeatedly without getting an answer from November 23rd to the 27th. Gerjuan Rowe (Gerjuan), Rowe's sister, testified that she talked with Rowe

---

2. Rowe's landline was used to place two calls to Southwest Airlines in the early morning of November 25th.

and borrowed $50 dollars from Rowe the weekend of November 20th and the weekend of November 27th and spoke with Rowe on Thanksgiving, November 25th.

Telephone records show no calls from Rowe's home telephone to Gerjuan after November 24th and no telephone calls from Gerjuan's cell phone to Rowe's home telephone from November 24th to December 3rd. A neighbor testified he saw the victim and her children the weekend after Thanksgiving. Beverly Conley, the children's aunt, testified that Alexus called her from Rowe's home late on November 27th or early on November 28th. However, the telephone records from Rowe's home indicate calls were made to Beverly Conley on November 19th and 21st. The children celebrated Thanksgiving with Conley and their father's side of the family the weekend of November 21st. Sherry Conley stated in a deposition that she spoke with Rowe on November 28th, but at trial testified she was mistaken and did not talk to Rowe on November 28th.

In the guilt phase, the jury deliberated for four and a half hours before finding Taylor guilty of all four counts of first-degree murder and four counts of armed criminal action. In the penalty phase, the State presented evidence of Taylor's prior convictions for possession with intent to distribute cocaine, forcible rape, forgery, and stealing by deceit, and a guilty plea for forcible rape. Testimony from a rape victim and three members of the victims' family were also offered. Pursuant to Taylor's decision, the only evidence Taylor offered was a stipulation entered and passed to the jury. The jury deliberated

for three hours before finding five aggravating factors for each victim.[3]

## III. Standard of Review

### A. Overview

 On direct appeal, this Court reviews a death penalty conviction for prejudice, not mere error, and will reverse the trial court's decision only when the error was so prejudicial that the defendant was deprived of a fair trial. *State v. Johnson (Johnson I)*, 207 S.W.3d 24, 34 (Mo. banc 2006). Prejudice exists when there is a "reasonable probability that the trial court's error affected the outcome of the trial." *Id.* Non-preserved issues are reviewed for plain error, if the error resulted in manifest injustice or a miscarriage of justice. *Id.* Evidence is reviewed in the light most favorable to the verdict and is reviewed for abuse of discretion. *State v. Johns*, 34 S.W.3d 93, 103 (Mo. banc 2000).

Taylor raises eleven points on appeal. Each point is denied.

### B. Evidentiary Standard of Review

 Taylor's points one through five and point eight refer to error in the admission of evidence. The admission of evidence is reviewed for abuse of discretion and disturbed only when the decision is "clearly against the logic of the circumstances." *State v. Reed*, 282 S.W.3d 835, 837 (Mo. banc 2009). The trial court's determination of the relevancy of evidence is reviewed for abuse of discretion. *State v. Wilson*, 256 S.W.3d 58, 61 (Mo. banc 2008). Likewise, the standard of review for publishing evidence to the jury is also

---

**3.** The aggravating factors were: (1) Taylor's two serious assaultive convictions for forcible rape in 1992 and in 2006; (2–4) the murder was committed while engaged in the unlawful homicides of the other three victims; and (5) depravity of mind, making the murders "outrageously and wantonly vile, horrible, and inhuman," which requires that the victims were killed "as a part of defendant's plan to kill more than one person and thereby exhibited a callous disregard for the sanctity of all human life."

abuse of discretion. *State v. Wolfe*, 13 S.W.3d 248, 260 (Mo. banc 2000).

A trial court can abuse its discretion through the inaccurate resolution of factual issues or through the application of incorrect legal principles. Where the facts are at issue, appellate courts extend substantial deference to trial court decisions. However, when the issue is primarily legal, no deference is warranted and appellate courts engage in de novo review. *See State v. March*, 216 S.W.3d 663, 664 (Mo. banc 2007); *Jones v. Fife*, 207 S.W.3d 614, 616 (Mo. banc 2006).[4]

Reversal due to an evidentiary error requires a showing of prejudice. *State v. Wolfe*, 13 S.W.3d at 260. Prejudice exists when "there is a reasonable probability that the trial court's error affected the outcome of the trial." *State v. Forrest*, 183 S.W.3d 218, 224 (Mo. banc 2006). Prejudice is presumed when admissible evidence is excluded and is rebutted by specific facts and circumstances. *State v. Barriner*, 111 S.W.3d 396, 401 (Mo. banc 2003).

## IV. Hearsay Statements

In points one through four, Taylor argues that the trial court abused its discretion in excluding certain statements as hearsay. Taylor argues that the statements were admissible pursuant to certain exceptions to the hearsay rule or pursuant to the curative admissibility doctrine.

## A. Legal Standards

### i. Hearsay

Hearsay is an "out-of-court statement that is used to prove the truth of the matter asserted and that depends on the veracity of the statement for its value." *State v. Kemp*, 212 S.W.3d 135, 146 (Mo. banc 2007). "Generally, courts exclude hearsay because the out-of-court statement is not subject to cross-examination, is not offered under oath, and is not subject to the fact finder's ability to judge demeanor at the time the statement is made." *Bynote v. Nat'l Super Markets, Inc.* 891 S.W.2d 117, 120 (Mo. banc 1995). Exceptions to the general prohibition against hearsay may apply when circumstances assure the trustworthiness of the declarant's statement. *Id.* The exceptions argued in this case are statements of present sense impression, statements of declarant's present mental condition, verbal conduct, and the constitutionally recognized exception under the due process clause.

For a hearsay statement to be admissible pursuant to the present sense impression exception, the statement must be made simultaneously, or almost simultaneously, with the occurrence of an event or act; the statement must describe or explain the event; and the declarant must perceive the event with his own senses. *State v. Smith*, 265 S.W.3d 874, 879 (Mo.App.2008) (*citing* 2 McCormick on Evidence § 271, at

---

4. For instance, appellate review of the trial court's legal determination of whether a statement is hearsay is given no deference and is reviewed de novo. *See State v. March*, 216 S.W.3d 663, 664 (Mo. banc 2007). Once a statement is classified as hearsay, the court must determine whether a hearsay exception applies. The trial court's findings as to the factual underpinnings of a hearsay exception are subject to deferential review, but whether those findings qualify as an exception to the hearsay rule is a legal question subject to de novo review. *See United States v. Rodriguez–Lopez*, 565 F.3d 312, 314 (6th Cir.2009); *Parker v. State*, 408 Md. 428, 970 A.2d 320, 325–326 (2009); *State v. Draganescu*, 276 Neb. 448, 755 N.W.2d 57, 78–79 (2008); *State v. Hazelwood*, 187 N.C.App. 94, 652 S.E.2d 63, 66 (2007); *State v. Newell*, 710 N.W.2d 6, 18 (Iowa 2006); *Dyson v. United States*, 848 A.2d 603, 611 (D.C.2004); *State v. White*, 804 A.2d 1146, 1150 (Me.2002); *State v. Ortiz*, 91 Hawai'i 181, 981 P.2d 1127, 1135 (1999).

251 (6th ed.2006)). These statements have certain indicia of trustworthiness to support their admissibility. *Id.* Errors in memory and time for calculated misstatements are not present because the statements are made as the declarant perceives the event or immediately thereafter. *Id.* Further, in most cases, "a witness will have observed the event and can corroborate the hearsay statement, and the declarant will often be available at trial for cross-examination to verify his or her credibility." *Id.*

▮▮▮▮ An out-of-court statement of the declarant's present mental condition is also admissible as an exception to the hearsay rule so long as the statements are relevant and their relevancy outweighs their prejudicial effect. *State v. Bell,* 950 S.W.2d 482, 483 (Mo. banc 1997). This exception is generally limited to cases "where the hearsay declarations of mental condition are especially relevant—particularly where the defendant has put the decedent's mental state at issue by claiming accident, self-defense or suicide." *Id.*

▮▮▮▮ A hearsay statement may also be admissible as a verbal act. *State v. Copeland,* 928 S.W.2d 828 (Mo. banc.1996); *See Copeland v. Washington,* 232 F.3d 969 (8th Cir.2000) (writ of habeas corpus granted on sentencing defect). This includes statements written or oral that have independent legal significance or effect. *See Estate of Oden v. Oden,* 905 S.W.2d 914, 918 (Mo.App.1995).

▮▮▮▮ Lastly, an out-of-court statement may be admitted pursuant to the constitutionally based hearsay exception in the due process clause. This exception applies to hearsay statements that "both exonerate the accused and are originally made and subsequently offered at trial under circumstances providing considerable assurance of their reliability." *State v. Hutchison,*

957 S.W.2d 757, 761 (Mo. banc 1997) (citing to *Chambers v. Mississippi,* 410 U.S. 284, 300, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973)). Three circumstances of reliability have been recognized: "1) each confession is in a very real sense self-incriminatory and unquestionably against interest; 2) each statement was spontaneously made to a close acquaintance shortly after the murder occurred; and 3) the statements are corroborated by other evidence in the case." *Id.* (internal quotations omitted).

### ii. Curative Admissibility Doctrine

▮▮▮▮ In addition to arguing exceptions to the hearsay rule, Taylor argues that several of the statements are admissible pursuant to the curative admissibility doctrine. The curative admissibility doctrine applies when one party introduces inadmissible evidence and allows the opposing party to introduce otherwise inadmissible evidence to rebut or explain inferences raised by the first party's evidence. *State v. Middleton,* 998 S.W.2d 520, 528 (Mo. banc 1999).

### B. Hearsay—Gerjuan's Payphone Conversation

In point one, Taylor argues the trial court abused its discretion in excluding Gerjuan's testimony that Rowe told her she was calling from a pay telephone on November 28th. Taylor argues that the testimony was admissible as Rowe's present sense impression or under the due process clause. In addition, he argues that the testimony was admissible pursuant to the curative admissibility doctrine to refute the inference that Rowe and Gerjuan did not speak to each other on that date from the absence of a call to Gerjuan in Rowe's home telephone records.

### i. Facts

Gerjuan Rowe was served with a subpoena to testify at trial. Gerjuan did not

appear and the court issued a writ of attachment. At the end of the State's case, Taylor's counsel informed the court that the writ had not been served, and that the defense intended to call Gerjuan as a witness in the case. As a result, the court granted Taylor permission to read portions of Gerjuan's deposition into evidence. The court, however, excluded the following portion as hearsay:

A. [Gerjuan] We was out walking around, and she did call me from a pay phone on Jennings Station Road and West Florissant at the Amoco.

Q. [Defense] Okay.

A. And I was supposed to have been on my way that way, but by my car not being legal and by Jennings police being ass holes, I didn't just go over there.

Q. But you knew she was at a pay phone then on the—

A. Yes.

Q. —on the early morning hours—

A. Yes.

Q. —of the 28th?

A. Yes.

MR. KEY: How did you know she was on a pay phone?

A. Because I asked her, I asked her, where are you? *And she said she was on the pay phone.* And I said—I was supposed to have been on my way to get her. I was supposed to have been on my way to get her, that's what I was supposed to be doing. That's how I knew she was at the Amoco on Jennings Station Road and West Florissant.

Q. (By Ms. Beimdiek) Were you ever able to actually hook up with her then?

A. No.

(Emphasis added).

The existence of the telephone call on November 28th was admissible, and testimony regarding such a call was admitted into evidence; however, evidence that Rowe was *calling from a pay telephone* was hearsay and inadmissible.

### ii. Analysis

■ Gerjuan's testimony that Rowe told her that she was *calling from a pay telephone* on November 28th was hearsay. The statement was offered for the truth of the matter asserted: that Rowe called Gerjuan from a pay telephone on November 28th.

■ This hearsay statement is not admissible as a present sense impression. The statement was about Rowe's location at a specific time in response to a question from Gerjuan. The statement did not concern an event or describe or explain an event that Rowe perceived. Further, the statement lacks indicia of trustworthiness. Taylor did not offer any evidence corroborating the statement that Rowe made the call from a pay telephone on November 28th. Although Gerjuan's cell phone records show an *outgoing* call to the pay telephone at 4:36 a.m. on November 28th, the statement was offered to prove that the Rowe *placed the call* from the pay telephone. There is no record of an incoming call from the pay telephone to Gerjuan's cell phone or any telephone, and there is no evidence of outgoing calls from the pay telephone. Lastly, neither Rowe nor Gerjuan was subject to cross-examination to resolve the confusion.

■ The statement is also not admissible pursuant to the constitutionally based hearsay exception in the due process clause because it lacks circumstances of reliability. The statement was not against Rowe's interest or spontaneously made, and most importantly, as discussed above, this statement is not sufficiently corroborated by other evidence in the case. In addition to the lack of evidence in the phone records, Gerjuan's testimony re-

garding the dates of events prior to the murders, such as when she last saw Rowe, was conflicting,[5] and the circumstances of this telephone call were also unclear.[6]

■ Finally, the curative admissibility doctrine does not apply. The State presented evidence of Rowe's home phone records and Gerjuan's cell phone records. This evidence was admissible, and as a result, Gerjuan's inadmissible testimony about the pay phone cannot be admitted pursuant to this doctrine.

Gerjuan's proposed testimony regarding Rowe's statement is hearsay and inadmissible. The trial court did not abuse its discretion.

### C. Hearsay—Calendar Notations

■ In point two, Taylor argues the trial court abused its discretion in excluding Gerjuan's testimony about Taylor's prior communication with Rowe and Rowe's

5. Early in the deposition, Gerjuan stated the last time she saw Rowe was:

> ... Saturday, the 20th. I borrowed fifty dollars from her on Sunday, the 21st. I told her I was going to give it back to her Monday. I didn't hear from her on Monday, so I called Tuesday, didn't get an answer on Tuesday. But I—it might have been—because I kept leaving voice messages, I never talked to her, I just left a lot of voice messages, I know that. My number was on that phone so much to where I don't—but I know Saturday—I seen her Saturday, Sunday, got the fifty dollars, and talked to her Monday.

> Mr. Key then asked if it was Monday, the 22nd, and she responded, "Yeah, talked to her Monday."

> Later, Gerjuan was asked about an interview she gave to police on December 3rd, the day the bodies were found. The relevant portion of the deposition is:

> Q. Now during that interview, do you remember telling the police that you had seen Angela on Saturday morning, the 27th?
> A. (Witness nods.)
> Q. You're shaking your head "yes."
> A. Yes.

notations in the calendar and in refusing to allow the jury to view the notations in the calendar. Taylor alleges Gerjuan's testimony is admissible as Rowe's present sense impression of Taylor's actions, as statements of Rowe's state of mind and under the due process clause. Lastly, he argues that the testimony and notations were admissible pursuant to the curative admissibility doctrine.

### i. Facts

The trial court prohibited Taylor from reading into evidence the following section of Gerjuan's deposition because it was hearsay:

> A. Yes, yes, yes, yes, yes. He was gone maybe six days a week out of seven days.
> Q. Would there be times when he wouldn't call her even to talk to her once he was on the road?

> Q. And that that's when you asked to borrow some money from Angela?
> A. Yes.
> Q. And that Angela actually came over to your house on that Saturday morning and gave you fifty dollars?
> A. Yes
> Q. Do you remember telling the police that?
> A. Yes, I believe.
> Q. And then do you also remember saying that you got a call from Angela around three or four in the morning on Sunday, the 28th?
> A. Would that be Saturday–Sunday morning?
> Q. Right, into the early morning hours.
> A. Right ...

> Gerjuan also testified that she spoke with Rowe on Thanksgiving, but Rowe never showed up to dinner. The above portions of the deposition were read into evidence.

6. Gerjuan testified that on November 28th, she was "out walking around" when Rowe called. She never said if Rowe called her cell phone or house telephone. The only telephone record showing a pay telephone is an outgoing call on Gerjuan's cell phone.

A. Right.

Q. Just was out of communication?

A. Phone off. Come over there.

The following portion of Gerjuan's deposition regarding Rowe's calendar was read into evidence:

Q. (By Ms. Beimdiek) I'm going to show you now what I've marked as Defendant's Exhibit 8, and see if you recognize that. Just flip those pages, if you would.

A. [Gerjuan] Uh-uh. Yeah.

Q. Do the notes on that, it's a calendar for 2004, do those notes appear to be also in [Rowe's] handwriting?

A. yes, some of it. Yes, these is [Rowe's], yes, I do believe.

The following portion of the deposition was excluded as hearsay:

Q. If you'll go to November of 2004—

A. Ooh. Ooh. Ooh. And this is us. I'm telling you, this is what we do. I might have a calendar like this too.

Q. She keeps track in there of when he's gone and—

A. Yes, yes, yes.

Q. That was just a habit that she had, right?

A. Uh-huh.

Q. *Now if you look at November 26th—*

A. Un-huh.

Q. *—does she write "off" there?*

A. *Yes.*

Q. And that's her handwriting as well?

A. Uh-huh.

Q. Now, had Angela discussed with you in November of 2004 that [Taylor] would be leaving town again or what his schedule was going to be?

A. No. The only time I would know is when he might not answer the phone or she was fed up with him, he had done it too much.

Q. Tell me more what you mean by that.

A. Like I come back Monday, I'm leaving on Wednesday, that's too much. You just got back, you're fixing to leave again.

Q. Right.

A. And when he would go, he stay gone weeks at a time.

Q. Right.

A. Weeks at a time.

(Emphasis added).

Rowe's calendar with her notations was admitted into evidence, but because the calendar contained hearsay, the calendar was not published to the jury. The first month included in the calendar is January 2004 and the last month is January 2005. The notations in the calendar were as follows.

From February to August, the notations include "didn't come home yet," "no call today" and "were home" and each of these notations was followed by "L.T." The other entries on these days were personal appointments. From September to November, "paycheck" and "off" are written every other Friday and "work," "off" or "home" are written on every Saturday and Sunday. In addition, written on most days up to November 15th is "home" or "no show, no call," but none of these entries contain "L.T." as in the previous months. The remaining entries from November 15th through January 2005 are personal appointments, with "off" and "paycheck" written every other Friday. Specifically, on November 26th, the notations are "off" and "paycheck."

## ii. Analysis

Rowe's statement to Gerjuan and Rowe's notations on her calendar were

hearsay. The statement and notations were offered for the truth of the matter: that it was not unusual for Taylor not to see or talk to Rowe for periods of time.

■ Neither is admissible as a present sense impression. There is no evidence that Rowe made these statements to Gerjuan or wrote the notations simultaneously on the discovery of the presence or absence of Taylor or shortly after Rowe spoke to or spent time with him. The statements and notations also lack indicia of trustworthiness as neither Rowe nor Gerjuan was available for cross-examination, there is no corroborating evidence that Taylor was with Rowe or talked to her on those days, and there is no evidence as to when Rowe made this statement to Gerjuan.

■ The state of mind exception also does not apply to the notations written on the calendar because the notations are not statements of mental condition, and most importantly, Rowe's state of mind is not particularly relevant because Taylor has not placed Rowe's mental state at issue.

■ The due process hearsay exception does not apply because there exist no circumstances of reliability. These statements and notations are not against Rowe's interest and were not made spontaneously after the event. Further, the statements are not corroborated by other evidence in the case. Although Gerjuan identified the handwriting in the calendar as Rowe's, Gerjuan had no personal knowledge of the calendar and never witnessed Rowe write any of these notations.

The curative admissibility doctrine does not apply. The State's evidence of telephone records from Rowe's home telephone and Taylor's cell phone were admitted to show that telephone calls between Taylor and Rowe ended in November. The State also offered testimony of Rowe's employer to establish that Rowe was absent from work on November 26th. Because this evidence was admissible, the inadmissible evidence of the testimony or notations cannot be admitted pursuant to this doctrine.

Gerjuan's testimony about the calendar and the notations in the calendar are hearsay and inadmissible. The trial court did not abuse its discretion.

### D. Hearsay—Check Carbon Copy

In point three, Taylor argues that the trial court abused its discretion in refusing to allow the jury to view Rowe's checkbook that contained a carbon copy of a "check" dated November 27th. Taylor argues that the November 27th "check" is relevant and does not contain hearsay. In the alternative, he argues that if the "check" does contain hearsay, it is admissible as a statement of Rowe's state of mind of her "belief that she was alive and physically able to write a check on that date" or admissible as verbal conduct.

#### i. Facts

A checkbook was seized from Rowe's home during the investigation. The checkbook is a duplicate check design, which contains a carbon copy paper behind each individual check. Rowe's checkbook contained a duplicate of a "check" dated November 27, 2004. This "check" is made out for the amount of $390.00, but the "pay to the order" line is blank. Rowe's home telephone number is written in the memo line. The checkbook was admitted into evidence, but it was not published to the jury because it contained hearsay.

#### ii. Analysis

■ The "check" dated November 27th is hearsay. It was admitted to prove that Rowe was alive on November 27th, which

was one day after Taylor left St. Louis. The "check" lacks reliability, as the payee line is blank, there is no evidence that anyone received the "check," or that anyone had knowledge of the existence of the "check."

■ Further, Taylor fails to show that an exception to the hearsay rule applies. The date written on the "check" is not a statement of Rowe's present mental condition and does not reflect any belief as to whether or not she was alive on that date, and Taylor has not placed Rowe's mental state at issue.

■ The check is not admissible as a verbal act, because there is no evidence that Rowe either completed or used the "check" as a legal document. It was not negotiated. There is no evidence that anyone received it, and there is no evidence of the purpose or circumstance under which Rowe wrote it, especially in light of the absence of a person or entity listed as the payee. *Estate of Oden v. Oden,* 905 S.W.2d 914, 918 (Mo.App.1995), dealt with completed legal documents acknowledged before notaries that were self-authenticated. It does not help Taylor, as this situation does not deal with a completed legal document.

The "check" is hearsay and inadmissible, and the trial court did not abuse its discretion in refusing to publish the checkbook to the jury.

### E. Hearsay—Rowe's Statement to Gerjuan

In point four, Taylor argues the trial court abused its discretion in excluding Gerjuan's testimony of Rowe's statement to Gerjuan that Taylor's relative lived at Rowe's house. Taylor alleges the testimony was admissible under the due process clause and the curative admissibility doctrine to refute the inference that only Tay-

lor could have committed the crime from the absence of any forced entry and the evidence that only Taylor had access to the home.

#### i. Facts

The trial court excluded the following portion of Gerjuan's deposition:

Q. (By Ms. Beimdiek): And I think you sort of said you knew that [Taylor] had a brother, but do you know anything more about him?

A. No. I don't know if that was the brother or the cousin that was living over there.

Q. But you knew somebody was living at the house?

A. Uh-huh, in the basement.

Q. How did you know about that?

A. Because I asked her, I said, is he the only one over there? She was like, no, his cousin had came from somewhere and was supposedly living over there.

Q. She called him his cousin?

A. Yeah, or the brother, one of them.

There was no evidence that Gerjuan had ever visited Rowe at her current residence prior to the discovery of the bodies. At trial, Perry Taylor testified that he allowed Rowe to use his vehicle when he was away as a truck driver. There was also testimony that Perry kept some belongings at Rowe's home. In addition, Rowe's neighbor testified at trial, stating that she saw a man walking out of Rowe's house around Thanksgiving; however, she did not recall the date and did not recognize the man.

#### ii. Analysis

■ Gerjuan's testimony that Rowe told her that Taylor's brother or cousin lived at Rowe's house was hearsay. The statement was made out of court and was offered for the truth of the matter: that another person had access to the house.

■ Taylor fails to show that an exception to the hearsay rule applies to this testimony. The statement is not admissible pursuant to due process hearsay exception because the statement does not exonerate the Taylor and lacks any circumstances of reliability. The statement is not against Rowe's interest, was not made spontaneously after an event, and was not sufficiently corroborated. Gerjuan had never been to Rowe's residence, and there was no additional evidence that another adult, such as Taylor's brother or cousin, lived in Rowe's home.

The curative admissibility doctrine does not apply. The State introduced testimony of three police officers, all of whom stated that the windows and doors were locked, the front door was undamaged, and the house was not ransacked. The State also introduced several properly admitted photographs depicting the condition of the house, including the doors and windows. Because the State referred to admissible evidence, Taylor cannot introduce inadmissible evidence pursuant to this doctrine.

Gerjuan's proposed testimony about the relative is hearsay and inadmissible. The trial court did not abuse its discretion.

### F. Conclusion

■ The evidence at issue in the four points was inadmissible, and the trial court did not abuse its discretion. Furthermore, Taylor was not prejudiced by the exclusion of this evidence. Although the above statements were excluded as hearsay, the jury was able to consider Gerjuan's testimony that she talked to Rowe on November 28th, Gerjuan's telephone records showing a telephone call at that date and time, as well as testimony that Perry left some belongings at Rowe's home. Additionally, this evidence pales in the light of Taylor's confessions and other corroborating evidence. Points one through four are denied.

### V. Admission of Phenolphthalein and DNA Test Results

In point five, Taylor argues the trial court abused its discretion in admitting evidence regarding the phenolphthalein test, the DNA test, as well as testimony about the results. Taylor argues that this evidence was irrelevant because the results were speculative and misleading. Further, he argues that the phenolphthalein test results were inadmissible pursuant to the decision in *State v. Daniels*, 179 S.W.3d 273, 281 (Mo.App.2005), because no confirmatory test for blood was conducted.

### A. Facts

Taylor's sunglasses were taken into evidence upon his arrest. Although blood was not visually apparent on the sunglasses, a phenolphthalein test—a presumptive test used to determine if there is a possible presence of blood—revealed a positive result on the sunglasses' nose guard. Because of the small size of the sample, a confirmatory test was not conducted.

The stain on the sunglasses was also tested for the presence of DNA. The analyst could not obtain a full genetic profile because of the small size of the sample. The results from the partial DNA profile eliminated Rowe's children as the contributors. Rowe was not eliminated as a contributor. The partial DNA profile obtained occurs in only one in 12,030 persons in the African–American population. The source of the DNA, whether from blood, hair, or saliva, could not be determined from the test.

In May 2007, Taylor filed a motion to exclude these test results. After a hearing, the trial court overruled the motion to exclude and granted Taylor's request for a

continuance to prepare and respond to the evidence. In January 2008, Taylor filed a motion in limine to exclude any evidence that the phenolphthalein test showed that the substance found was or presumptively was blood. The court conducted a hearing under *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), about the admissibility of the phenolphthalein test results and over-ruled Taylor's objection, allowing evidence of the phenolphthalein test results as a presumptive test for the presence of blood.

At trial, Taylor objected to the admission of this evidence and the trial court overruled the objections. The forensic scientist who conducted the tests testified that the phenolphthalein test is a presumptive test because it also can give a positive reaction to potatoes, rust, bleach and nickel. She emphasized that the substance on the glasses was only "possibly blood" because there was no confirmatory test.

During closing arguments, the State commented that the sample was Rowe's blood, not the children's blood.[7] Taylor objected that the argument was a misstatement of the testimony. The trial court overruled the objection.

### B. Analysis

 Scientific tests do not have to be conclusive to be admissible. Although some states require that the test be conclusive, other states have held that presumptive blood tests are admissible as long as the test is accurately described so it is helpful to the jury. *See State v. Canaan*, 265 Kan. 835, 964 P.2d 681, 694 (1998); *State v. Stenson*, 132 Wash.2d 668, 940 P.2d 1239, 1264–65 (1997). If the jury is fully informed, the fact that the test may react positively to substances other than blood affects the weight given to the evidence, not its admissibility. *See State v. Ferguson*, 20 S.W.3d 485, 495 (Mo. banc 2000); *Canaan*, 964 P.2d at 694.[8]

---

7. The relevant portion of the State's closing argument is:

> ... DNA. Big fight about it. Small amount. One in twelve thousand nine hundred thirty, I believe, that it's the victim. But the one thing [a forensic scientist] was consistent on, it's the victim's blood, it's not the kids it's the victim—
> MS. BEIMDIEK: Objection, that's a misstatement of the testimony.
> THE COURT: The jury will recall the testimony.
> ...
> Remember that, the one nose piece is where they swab, and detected I mean it .03 nanograms of blood, but that's one—
> MS. BEIMDIEK: Objection, Your Honor, I have to object, nobody testified that it's blood.
> MR. KEY: I will take that back, Your Honor. It was presumptively tested for blood. There wasn't enough to take a chance on not being able to test a confirmatory test without doing DNA. That was a call by [a forensic scientist], that was the right call to make. It was presumptive blood. We have a bloody room, a bloody struggle, and a

> piece of blood of Angela Rowe's on his glasses ...

Taylor's closing argument on this point is:
> ... Now, Mr. Key wanted to keep calling that blood on those glasses. Oh, no. Nobody can tell you that. The best you have is a lab technician who runs this phenolphthalein test where she adds some chemicals and she watches it, and then she gets to decide independently if there's a change in color after she applies those chemicals. There's no machinery, there's no computer, there's no chart to gauge a color change but it's a judgment call ... What do we know about that phenolphthalein test? What did you learn about that science? Blood is the not the only thing that reacts. Horse radish, potatoes, vegetables, rust, bleach, nickel, mental alloyed. What was in the bag that they claim those glasses came out of? Batteries. What's in batteries? Nickel. Where did these glasses come from? You're going to have to answer that question ...

8. Expert testimony is admissible under *Frye* when it is "sufficiently established to have gained general acceptance in the particular

The test results were relevant and admissible. Although a conclusive test for blood was not performed, the scientific testimony at trial informed the jury that the phenolphthalein test was only a presumptive test, indicating only the possible presence of blood, and that no confirmatory test had been performed because of the size of the sample. The evidence of the test results was not misleading because the jury was informed of the size of the sample and the nature and limitations of the test performed and the respective results.

Taylor's reliance on the decision in *State v. Daniels*, 179 S.W.3d 273 (Mo.App.2005), is misplaced. *Daniels* found that the trial court erred in permitting evidence of positive luminol test results as conclusive proof of the presence of blood in the defendant's car and house without conducting a *Frye* hearing to determine if such tests are conclusive. *Id.* at 285.

In this case, the court conducted a *Frye* hearing prior to admitting the results and the jury was well informed that the test results only indicated the possible presence of blood. Further, the DNA test results were consistent with the positive presumptive test result for blood, producing a partial DNA profile for which Rowe was a potential contributor.

The trial court did not abuse its discretion in admitting the test results. Point five is denied.

## VI. State's Disclosure of Test Results

In point six, Taylor argues that the trial court abused its discretion in overruling Taylor's motions to exclude the test results based on the timing of the disclosure of this evidence prior to trial. He argues that the State had no valid reason to delay the testing for almost two years, which resulted in Taylor receiving this evidence shortly before trial.

### A. Facts

When Taylor was arrested in December 2004, police recovered a pair of sunglasses from a bag in Taylor's possession. On September 15, 2005, Taylor requested notice of whether the State intended to use DNA evidence, the type of DNA testing that would be conducted, and whether the State had physical evidence submitted for analysis or examination.

On May 25, 2006, Taylor filed a motion, requesting the return of his personal property, including the sunglasses. In August 2006, the State took possession of the sunglasses from the police, and three months later in November, the bag and sunglasses were brought to the crime lab for testing. The phenolphthalein test was performed in

---

field in which it belongs." *State Bd. of Registration for the Healing Arts v. McDonagh*, 123 S.W.3d 146, 152 (Mo. banc 2003). *Daubert* rejected the *Frye* standard and applied Federal Rule of Evidence 702, which provides that an expert may give opinion testimony if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *Schumann v. Mo Highway and Transp. Comm'n*, 912 S.W.2d 548, 554 (Mo.App.1995). Section 490.065 contains the admissibility standard for expert testimony in civil cases. *See State*

*Bd. of Registration for the Healing Arts*, 123 S.W.3d at 149. Section 490.065 provides that in a civil action, an expert may testify in the form of an opinion or inference so long as the facts or data upon which the expert bases the opinion or inference are "reasonably relied upon by experts in the field in forming opinions or inferences upon the subject" and are "reasonably reliable." The Court has not previously decided which standard—*Frye, Daubert,* or a rule comparable to that enacted in section 490.065 for civil cases—applies in criminal cases, and Taylor does not challenge the trial court's application of the *Frye* standard in this case.

November 2006, and the DNA tests were performed from December 2006 to January 2007. The DNA report was completed in April 2007.

Taylor received the report from the phenolphthalein test in March 2007 and the DNA report in April 2007. At this time, the trial was set to begin on May 30, 2007. In April 2007, Taylor filed a motion to exclude the evidence of the phenolphthalein and DNA testing based on the late disclosure, and alternatively, if the evidence was not excluded, Taylor requested a continuance.

A hearing was held in May 2007 at which the State explained that they disclosed the reports as soon as they received them and did not withhold the evidence purposely. The trial court overruled the motion to exclude the DNA evidence and granted Taylor a continuance until February 2008 with the "understanding that the request is being made reluctantly and only due to the facts and circumstances that gave rise to this motion."

### B. Analysis

■■■■ The trial court has discretion to impose sanctions for discovery violations under Rule 25.03. *State v. Edwards*, 116 S.W.3d 511, 534 (Mo. banc 2003). "A trial court's denial of a requested sanction is an abuse of discretion only where the admission of the evidence results in fundamental unfairness to the defendant." *Id.* Such fundamental unfairness exists if there is "a reasonable likelihood that the failure to disclose the evidence affected the result of the trial." *Id.* Rule 25.03 governs discovery in a criminal proceeding and requires the State to disclose upon request any reports or statements of experts including results of scientific tests, experiments, or comparisons.

■■■■ The State had access to this evidence since Taylor's arrest in December 2004, but the tests were not performed until shortly before trial. However the State disclosed the results as soon as they were completed, and the record does not reveal bad faith on the part of the State. Taylor was also provided additional time for discovery and to prepare for trial on account of this disclosure. Most importantly, trials are truth-seeking procedures and exclusion of relevant evidence is not favored.

The trial court's decision to admit the evidence and grant Taylor a continuance to determine how or if to respond to this evidence was not an abuse of discretion. Point six is denied.

### VII. Right to a Speedy Trial

In point seven, Taylor alleges that the trial court erred in proceeding to trial, entering judgment, and sentencing Taylor in violation of his statutory right to a speedy trial pursuant to section 217.450 as well as his constitutional right to a speedy trial under the federal and Missouri Constitutions. Specifically, Taylor argues that there was no good cause to grant the continuances when new counsel was appointed and after the admission of the phenolphthalein and DNA test results.

### A. Facts

In December 2004, a complaint was filed charging Taylor with four counts of first-degree murder and four counts of armed criminal action. In February 2005, private counsel entered his appearance on Taylor's behalf. The complaint was superseded by an indictment filed on March 30, 2005. In April 2005, Taylor began serving a 100-year sentence on an unrelated conviction and in July 2005, filed a request for disposition for the pending charges.

In August 2005, private counsel filed a motion to withdraw on the basis that inad-

equate financial resources prevented him from providing adequate representation for Taylor. The court granted the motion and continued the case until September 16, 2005, for entry of new counsel. The court ordered that the period from August 11th to September 16th be tolled for purposes of the Uniform Mandatory Disposition of Detainers Law (UMDDL).

A public defender entered an appearance on August 26, 2005. On September 15, 2005, the State filed notice of intent to seek the death penalty, and three public defenders from the capital trial division entered an appearance.

A hearing was held on September 16, 2005, at which Taylor's counsel requested a continuance based on the complexity of the capital murder case, the need for extensive discovery for both the guilt and penalty phases, and the additional trial obligations of the next year. Taylor objected to this request. The court granted the request, and trial was set for October 11, 2006.

In November 2005, the State filed a motion to reconsider the order extending the trial date, arguing that Taylor properly filed his speedy trial request and that as a result, the case should be tried before January 21, 2006. The State was also concerned with whether Taylor's counsel's caseload was sufficient good cause to continue the case. After a hearing was held, the trial court denied the State's request.

In July 2006, Taylor's trial counsel filed a motion to continue, requesting additional time for investigation and preparation for trial. After a hearing, the trial court overruled the motion. A motion to reconsider this denial was filed and included "Defendant's Consent to Continuance" signed by Taylor, requesting that the case be continued, "as additional time is needed for defense counsel to prepare for trial." Judicial notice was taken of the arguments raised at the previous hearing, and the case was continued to May 2007.

In September 2006, the case was transferred to a different judge. In October 2006 and April 2007, Taylor filed pro se motions to dismiss for violating the UMDDL; the trial court overruled both.

Taylor's counsel's final request for a continuance occurred in April 2007 in connection with the State's disclosure of the test results. Taylor objected to this continuance. The trial court, after overruling Taylor's motions to exclude the evidence, granted the continuance, and trial was held on February 25, 2008.

### B. Analysis

#### i. Right to Speedy Trial pursuant to UMDDL

 Taylor invoked his right to a speedy trial pursuant to the UMDDL, section 217.450–485.[9] The UMDDL, including the right to be tried within 180 days, is reviewed de novo. *State v. Nichols,* 207 S.W.3d 215, 219 (Mo.App.2006) [10]

The UMDDL provides that a defendant who currently is confined in a department correctional facility may request a final disposition of an untried indictment.[11] Section 217.460 provides that:

---

9. The UMDDL protects the same interest as provided in the speedy trial statute, section 545.780. The UMDDL, however, applies when a defendant is serving a sentence and has other pending charges. *State ex rel. McKee v. Riley,* 240 S.W.3d 720, 728 n. 11 (Mo. banc 2007); *see also* section 217.460.

10. In its most recent completed session, the General Assembly amended the 180–day rule so that dismissal only occurs when there has been a constitutional violation, 2009 Mo. Legis. Serv. H.B. 62, 481.

11. Section 217.450.1 provides:

Within *one hundred eighty days* after the receipt of the request and certificate, pursuant to sections 217.450 and 217.455, by the court and the prosecuting attorney *or within such additional necessary or reasonable time as the court may grant, for good cause shown in open court,* the offender or his counsel being present, the indictment, information or complaint shall be brought to trial . . . (emphasis added).

■■■■■ The trial court has discretion to allow a continuance for good cause. *State ex rel. Wolfrum v. Wiesman,* 225 S.W.3d 409, 412 (Mo. banc 2007). Defense counsel may show good cause for a continuance under the statute even if defendant objects so long as the request is based on reasonable grounds showing the delay is for good cause. *Id.* Once a defendant invokes the right to counsel, counsel has the authority "to seek reasonable continuances for the purpose of assuring effective assistance of counsel." *Id.*

The court had good cause to grant the continuances. Although the continuances were requested over Taylor's objection, the requests were sought to prepare for trial after appointment as well as to respond to newly discovered evidence before trial. Given the complexity of the trial and the amount of preparation and investigation required, counsel established sufficient grounds for good cause for the delay, and the additional time ensured that Taylor received effective assistance of counsel. Further, the requests were granted in open court with Taylor and counsel present. Taylor fails to show a violation of the UMDDL.

> Any person confined in a department correctional facility may request a final disposition of any untried indictment, information or complaint pending in this state on the basis of which a detainer has been lodged against him while so imprisoned.

## ii. Constitutional Right to Speedy Trial

■■■■■ The defendant's right to a speedy trial is founded upon the Sixth Amendment of the United States Constitution and Mo. Const. art. I, § 18(a). The United States and Missouri constitutions provide equivalent protection for a defendant's right to a speedy trial. *State ex rel. McKee v. Riley,* 240 S.W.3d 720, 729 (Mo. banc 2007). To assess whether a right has been respected or denied involves a balance of four factors: (1) the length of delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant. *Id.*

It is undisputed that the delay here was lengthy and that Taylor effectively asserted his right to speedy trial. As discussed above, the reason for a substantial portion of the delay was to provide counsel with more time to prepare for trial, which effectively protected Taylor's right to effective assistance of counsel. Moreover, Taylor was not prejudiced by this delay because he was concurrently incarcerated on unrelated charges and serving a sentence of 100 years.

Taylor fails to show a violation of his constitutional or statutory right to speedy trial. Point seven is denied.

## VIII. Admission of Perry Taylor's Statement

Taylor alleges the trial court erred and abused its discretion in overruling the motion to exclude Perry Taylor's redacted statement. Taylor alleges that the detective's statements vouched for Perry's cred-

> The request shall be in writing addressed to the court in which the indictment, information or complaint is pending and to the prosecuting attorney charged with the duty of prosecuting it, and shall set forth the place of imprisonment.

ibility and invaded the province of the jury.

## A. Facts

On December 8, 2004, Perry Taylor, Taylor's brother, was taken into custody and questioned regarding allegations against his brother. During this interrogation, Perry told the detectives that Taylor had called him and admitted to murdering Rowe and her children.

At trial, the State called Perry as a witness. When questioned about his statement during the interrogation, Perry stated that he did not recall the events. The State then told Perry, "I'm going to ask you basically these questions that were asked of you that night and your responses; you can tell me if they're true or not, okay?" The State read the following portions of Perry's statement:

> SPEAKER TWO [Detective]: Right. But you didn't do it?
>
> PERRY TAYLOR: No, I didn't have anything to do with it.
>
> SPEAKER TWO: Right.

The State asked if this statement was correct, and Perry replied, "[t]hat would not be correct." Taylor objected to the statements in a pre-trial motion and at trial on grounds that the detective expressed an opinion. The trial court overruled the objection, finding the statement was not expressing an opinion but asking a question.

The detective who conducted the interview also testified. The following portion of Taylor's statement was read into evidence:

> SPEAKER TWO [Detective]: Because he had already told you before Thanksgiving what had happened, right?

PERRY TAYLOR: Yeah.

SPEAKER TWO: Was that the day before? Two days before?

PERRY TAYLOR: He probably told me that—well, I want to say the day before Thanksgiving.

SPEAKER TWO: So the day before Thanksgiving—

PERRY TAYLOR: I'm thinking, I'm not even sure about that, I think so.

SPEAKER TWO: Okay, I think you're right.

Taylor again objected on the grounds that the detective expressed an opinion, which the court overruled.

## B. Analysis

■ The trial court did not abuse its discretion in admitting Perry's statement. The detective's statements of "right" and "I think you're right" are not opinion statements. The detective made these statements in the course of a police interrogation and given this context, it is reasonable to assume that the detective used these words and phrases simply to acknowledge what Perry had said and for him to continue answering the detective's questions. These statements did not express an opinion regarding the Perry's credibility or innocence.[12] They were only a pattern of speech. Furthermore, the State offered these portions of the police interrogation for Perry's statements, not for the detective's statements. The trial court did not abuse its discretion in admitting the detective's statements. Point eight is denied.

## IX. Strike for Cause

In point nine, Taylor argues the trial court erred and abused its discretion in

---

12. Because the detective's statements are not opinion testimony, the Court need not address Taylor's arguments regarding the admissibility of lay witness and expert opinion testimony.

striking Juror Tumminia for cause because she expressed no views that would substantially impair her duties as a juror or her ability to follow the trial court's instructions.

## A. Facts

During the State's voir dire, the following exchange occurred:

MR. KEY [State]: Anybody else on the panel of ten here? *Anybody else has a deep rooted personal belief against the death penalty that you would not be allowed to consider the full range of punishment?*

It's important for us, as it is for them, that you weigh the evidence, *you look at everything, you take your time and you legitimately can consider life to death as punishment; okay?*

PANELIST TUMMINIA: *I would have qualms about it. I would have difficulty.*

MR. KEY: you would have—

PANELIST TUMMINIA: *I'm not certain I could go for death.*

MR. KEY: Okay. And this is— your name is Kathleen Tumminia?

PANELIST TUMMINIA: Tumminia.

MR. KEY: Tumminia?

PANELIST TUMMINIA: Yes.

MR. KEY: And when I first asked the question Andrea's the only one that raised her hand. Are you on the fence or are you saying now after listening to what I'm explaining you don't think you could ever give the death penalty?

PANELIST TUMMINIA: I find this an overwhelming question—I find your question overwhelming at this point, I'm not certain how I feel because I've never considered it seriously before.

MR. KEY: Okay. And obviously when you all walked in today you had no idea

what kind of case you were going to be walking into.

PANELIST TUMMINIA: Right.

MR. KEY: It's not a stealing case, not a robbery case; it's the most serious case you can have in the State of Missouri. So as you speak now, after you've listened to all the facts in the case, thought there was enough facts to convict him of Murder in the First Degree and then you go to the second stage, and you're sitting here now, and there's aggravating facts put on, mitigating fact put on. Are you saying now that the shock of being here today, the fact that you've never really considered, really thought too much about the death penalty is what I'm assuming, *that you're not sure you can follow the Judge's instruction, consider the full range of punishment?*

PANELIST TUMMINIA: Well, I just think it's such a thorny issue, I don't know if it's a black/white, I can't see it being drawn very clearly right now because of all the words like aggravated, mitigating, Judge's instructions; there's so many things to take into consideration here. And I don't understand the whole ball of wax. *To say yes or no when you don't understand the situation is difficult.*

MR. KEY: *What we're asking you though is if you can consider the full range of punishment. What I'm looking for is people absolutely could not ever consider death. They're against the death penalty, they think it's wrong, they can never sit on a jury no matter, they will always vote for life no matter what the facts are; is that what you're saying.*

PANELIST TUMMINIA: *I'm not sure which way I would go.*

MR. KEY: It's not so much which way you'll go, if you're on the fence. *You*

*can never go for death if you were put in this situation.*

PANELIST TUMMINIA: *Perhaps.*

MR. KEY: So it's not so much, you should say, life or death. *It's at the point of the second phase you're not sure you can be back there and go, I don't believe I'm here, I can never give the death penalty?*

PANELIST TUMMINIA: *I don't know if I could sleep at night.*

MR. KEY: But the question I'm asking you, if you got to the second stage do you think you would get back there, *I don't know if I can consider the full range of punishment, I think I might only consider life; is that what you're saying now?*

PANELIST TUMMINIA: *I'm just saying I'm on the fence, and I don't know if I could be open to the whole range of possibilities that you're offering.*

MR. KEY: That's all I need. . . .

(Emphasis added).

The following occurred during Taylor's voir dire:

MR. WOLFRUM [Defense]: . . . Any members of the panel engaged in earnest discussion with others about your views on the death penalty, or written something for—I don't know a class or publication about your views about the death penalty? And I know I saw a hand, is it—am I pronouncing—

. . .

PANELIST TUMMINIA: I teach argumentation, I am the debate coach for Lincoln–Douglas Debates. I've published various balance sheets on both sides. I've been involved politically, down in Potosi along the lines of vigils, a member of Amnesty International.

MR. WOLFRUM: Okay. So have you written things arguing both sides?

PANELIST TUMMINIA: Yes.

MR. WOLFRUM: Okay. And I know on the initial questioning, I tried to write down what you say. So you—sort of an overwhelming question?

PANELIST TUMMINIA: It is too huge to even, you know, get your hands around for me, there's so many sides and issues involved.

MR. WOLFRUM: And that's what we're trying to do is get our hands around it here, and you've had some time to listen to both Mr. Key and me talk. If you found a person guilty of the charges as I've described them, and nobody's asking you to commit to what you would do at this point in time, understand that, *would you be able to give realistic consideration to both punishments that have been described?*

PANELIST TUMMINIA: *I think I could be fair and firm, I think I could isolate what takes place from my emotional concern about life, my more—I guess spiritual learning toward my faith and such. I think I could be fair, if I had a balance sheet in front of me.*

MR. WOLFRUM: And I don't know about a balance sheet, *but do you think you could follow the Court's written instructions—*

PANELIST TUMMINIA: *Yes.*

MR. WOLFRUM:—*as they've been described to you here this morning?*

PANELIST TUMMINIA: *I think I could deal realistically with it.*

MR. WOLFRUM: *And could you give realistic consideration to both punishments?*

PANELIST TUMMINIA: And I don't think economics has anything to do with it.

THE COURT: I'm sorry, I didn't hear the last part?

PANELIST TUMMINIA: I don't think economics has anything to do with it.

(Emphasis added).

The State moved to strike Juror Tumminia for cause and Taylor objected. The following exchange occurred:

MR. KEY [State]: Your Honor, State would move for No. 3 and No. 9 for cause.

THE COURT: Any objections?

MS. BEIMDIEK [Defense]: Yes. No. 3, she did indicate she could consider both punishments.

MR. KEY: Your Honor, the State feels she was being untruthful. When the State was talking to her she said she wasn't sure, she actually said she may not consider death. And then when the defense is talking to her she states she's doing vigils down in Potosi.

Obviously she's not doing the vigil hoping somebody will get the death penalty. She's on a debate team, she's a teacher, she's down there doing a vigil against the death penalty. And she never said that, when we bring it up during State's questions. Obviously there's only one way she's down there doing a vigil.

And when she says, when the State was talking to her, she would probably not consider death. And then when the defense is talking to her she jumps on their side, and you know.

MS. BEIMDIEK: She did not say she was protesting one way or the other. She described being in an academic setting, argued both sides, studied both sides. She didn't say I'm down there saying don't execute them. And the State didn't ask that specific question of her. She said I could be fair. I'm a debate coach. Argued on both sides of this issue.

And so I think the mere presence at a vigil does not necessarily mean she was protesting against a death sentence.

THE COURT: *I don't think she ever came out and said—I don't know she was—she was asked the direct question about five times, I don't know that she ever gave a direct answer to can you consider both punishments, life without parole and death. I don't think she was ever—she ever answered that question. She—the last time it was asked she said I think I could be fair, she never said yes I can.*

*I found that when she was responding to the questions propounded by Mr. Key, that she said she wasn't certain, she was equivocating, she said I just can't—it's such a big issue, I just can't get my hands around it. And she never answered the question one way or the other.*

MR. WALDEMER [State]: Judge, I have in my note she indicated she doesn't know she could sleep at night with the death penalty. She indicated she doesn't know she's open to the whole range of punishment. As you said she indicated I'm not certain, she couldn't say one way or the other. So our position would be she certainly equivocated and can't assure us that she can consider both punishments.

MS. KRAFT [Defense]: Judge, I have in my notes I have—the last question I have she was asked could you realistically consider both punishments and she said yes.

THE COURT: I was looking for that from her and I didn't hear it.

Can you go back the read her answers back to us?

[The court reporter read the last ten lines from Taylor's voir dire]

. . .

THE COURT: *So that's not what she said. I will allow the strike.*
(Emphasis added).

## B. Analysis

 This issue was addressed in *State v. Johnson*, 284 S.W.3d 561, 580 (Mo. banc 2009), in which this Court said:

A strike for cause is reviewed for abuse of discretion. *State v. Tisius*, 92 S.W.3d 751, 763 (Mo. banc 2002). The standard to remove a juror for cause because of his or her position on the death penalty is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Id.* (quoting *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985)).

While a juror's qualification is determined from the entire voir dire and not from a single response, the trial court may give more weight to a single response when presented with "conflicting testimony regarding a prospective juror's ability to consider the death penalty." *Id.* In determining a juror's qualifications, the trial court is granted broad discretion given its position to observe the juror. *State v. Ringo*, 30 S.W.3d 811, 816 (Mo. banc 2000).

Moreover:

What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear;' *these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Witt*, 469 U.S. at 424, 105 S.Ct. 844 (Emphasis added).

Juror Tumminia's testimony regarding her ability to consider the death penalty was conflicting. During the State's voir dire, she states that she would have "difficulty" considering the death penalty and was not certain if she could consider the full range of punishment. During the Taylor's voir dire, she states that she could be "fair and firm." Further, she never directly answers whether she could consider the full range of punishment. Given this testimony, the trial court that observed Juror Tumminia had broad discretion in determining her qualifications. Taylor has not shown an abuse of discretion. Point nine is denied.

## X. Closing Arguments

In point ten, Taylor argues the trial court plainly erred in not intervening *sua sponte* in response to two comments made in the State's closing arguments. First, Taylor argues that the court erred in allowing the State to refer to the excluded testimony that Rowe had called Gerjuan from a pay telephone on November 28th. Second, Taylor argues that the court erred in allowing the State to comment on the failure of Taylor to call a witness to refute the testimony of Dr. Burch, the medical examiner.

### A. Standard of Review

 Taylor did not object to these statements at trial and did not raise either argument in his motion for new trial. Therefore, the Court will review for plain error. The standard of review was addressed in *State v. Johnson*, 284 S.W.3d 561, 573 (Mo. banc 2009), which stated:

Plain error review of a closing argument not objected to will be considered only if "there is a sound, substantial manifestation, a strong, clear showing, that injustice or miscarriage of justice will result if relief is not given." *Johnson I*, 207 S.W.3d at 49. A conviction is reversed

due to an improper closing argument when the argument "had a decisive effect on the jury's determination." *Id.* The burden is on the criminal defendant to show a decisive effect. *Id.* Rarely is plain error relief granted for a closing argument claim, absent an objection, because it may be a strategic decision by counsel. *Id.* The trial court is vested with discretion regarding closing arguments. *Edwards,* 116 S.W.3d at 537. The entire record is considered when interpreting a closing argument, not an isolated segment. *Id.*

### B. Comment regarding Gerjuan's Testimony

 At trial, Gerjuan Rowe's deposition was read into evidence. The trial court found Gerjuan's testimony that Rowe called Gerjuan from a pay phone on November 28th was hearsay and inadmissible. However, testimony as to the phone call was permitted.[13] During closing arguments, the State argued:

. . . Look at the records here on Gerjuan Rowe. Phone calls from the victim's house to Gerjuan. Those two calls I told you about the early morning hours, twenty-two minutes after midnight on the 24th. That's her sister. We played—we read into evidence Gerjuan's depo. Of course Gerjuan first time says last time I talked to her was the 20th and 21st, the correct weekend. But when she's questioned again she changes.

She has drug problems, drug convictions. Very upset about this. You heard the depo. She kind of makes it to where the 27th, 28th where all these phone calls were happening, there's trouble, there was a falling out, she said. Probably the defendant and the victim.

Look at the amount of calls that happened on the 21st, 22nd, 23rd. She's correct, she has the wrong weekend.

I also asked Dan Jensen, did you go through Gerjuan Rowe's records line by line? And when was the last time her outgoing called the victim's house? November 23rd. So whatever the defense wants to say about Gerjuan Rowe what you know from these facts is that the last call—Charter counts only outgoing calls, the last outgoing call to Gerjuan Rowe was on the 24th at 12:22 a.m., twenty-two minutes after midnight. And that's from the victim to her sister Gerjuan Rowe.

And if you look at the records, Gerjuan Rowe's Sprint, which captured the incoming and outgoing, you will not find the victim's number after 11/23. Two cell phone companies or one house company and one cell phone, there's absolutely no communication between these two women, sisters, from 11/24 after the—after twenty-two minutes after the hour ever again . . .

The State did not refer to the inadmissible statement in Gerjuan's testimony that Rowe had told Gerjuan that she was calling from a pay telephone. In making its closing arguments, the State referred to Gerjuan's and Rowe's telephone records to refute Gerjuan's testimony that she spoke to Rowe after November 24th. The telephone records as well as Gerjuan's testimony that she spoke to Rowe on November 28th were admitted as evidence. It was not plain error to allow these statements.

### C. Comment regarding Dr. Burch's Testimony

 Dr. Burch, the medical examiner, testified on direct examination that Rowe

---

**13.** See discussion at section IV, part B.

and her children had been deceased for two to three weeks before being discovered on December 3rd. On cross examination, Dr. Burch acknowledged that he previously stated in his first deposition that the victims had been deceased for two to three days before being discovered and that it was unlikely they had been deceased since November 23rd. Dr. Burch explained this discrepancy, stating that his testimony in the first deposition did not account for the fact that the air conditioner was turned to 50 degrees, which affected the temperature in the house and his assessment as to time of death.

During closing arguments, Taylor argued:

... What does Dr. Burch say in his initial deposition before he got prepared by learning that [Taylor] left on the 26th? Most likely time of death was two to three days before they were discovered. They're discovered on the 3rd, what did Dr. Burch say? Most likely time are these two to three days before they're discovered. That is his medical opinion ...

[Taylor continues to discuss the condition in which the bodies were found] ... And Dr. Burch wanted to make some distinction which maybe you understood, about 50 degrees. Well, my opinion changed when I realized that here was an air conditioner running in that house.

In rebuttal, the State argued:

... And believe me if there's somebody else that could refute Dr. Burch they would have put them on the stand. And in his deposition he said three to ten days. It happens on the tenth day.

■ It is permissible for the State to make retaliatory arguments at closing in response to issues raised by the defense. *State v. Clayton*, 995 S.W.2d 468, 479 (Mo.

banc 1999). Here, the State's argument responded to Taylor's argument regarding the credibility of Dr. Burch's testimony. The State's comment that Taylor could have called another witness to testify about the date of death pertained to Taylor's failure to present additional evidence about this issue, not the failure to call a particular witness. This retaliatory argument was permissible in closing arguments.

Taylor fails to show a plain error in allowing these comments during closing arguments. Point ten is denied.

## XI. Taylor's Appearance in Handcuffs

In point eleven, Taylor argues that the trial court abused its discretion in overruling Taylor's request for mistrial when he was handcuffed and removed from the courtroom after the guilty verdicts were announced.

### A. Facts

Prior to trial, Taylor filed a motion to appear in his own clothing and without restraints at court appearances and when transported to and from court. The trial court sustained the motion, but stated that the ruling would change if "the defendant would himself do something that would cause me to feel that as a security measure that I have to reverse my original order."[14]

After the guilty phase verdict was read, Taylor was handcuffed and removed from the courtroom. Taylor's counsel immediately requested a mistrial because Taylor was handcuffed in front of the jury. The trial court denied the request because Taylor had "just been convicted of four counts of murder in the first degree."

14. Taylor did wear a leg brace that was not visible.

At the sentencing hearing, the State made the following comment:

> ... From the State's perspective I just wanted to include a couple of things for the record. Throughout the trial the Department of Justice Services had informed the State that defendant had an intention to act out, that there may be a problem in the trial. I know that I did conveyed [sic] that to the Court. From our perspective, from what we were aware of.
>
> I think also there was no prejudice to the defendant, in the first phase of the trial it was made very clear from both parties the defendant was confined throughout the trial. The State in its case in chief played a tape of a telephone call he made from the jail to his brother Perry Taylor. So there was no prejudice to him in any event because the jury was clearly aware of the fact he was in custody the entire time.

### B. Analysis

 The trial court has discretion to grant a mistrial, which is a "drastic remedy and should be employed only in the most extraordinary circumstances." *State v. Brooks*, 960 S.W.2d 479, 491 (Mo. banc 1997).

 A defendant cannot routinely be visually shackled in the guilt or penalty phase of a criminal trial "unless that use is 'justified by an essential state interest'— such as the interest of courtroom security—specific to the defendant on trial." *Deck v. Missouri*, 544 U.S. 622, 624, 125 S.Ct. 2007, 161 L.Ed.2d 953 (2005). "Although shackling in the presence of the jury should be avoided if possible, not every incident in which a jury observes the defendant in shackles requires a mistrial." *Brooks*, 960 S.W.2d at 491 (internal citations omitted). In fact, "brief, inadvertent exposure of the jury of a handcuffed defen-dant while he is being taken from one place to another does not deprive defendant of a fair trial." *State v. McMillian*, 779 S.W.2d 670, 672 (Mo.App.1989), *citing State v. Crawford*, 539 S.W.2d 633, 635–36 (Mo.App.1976).

In *Brooks*, the defendant was hand-cuffed when the guilty verdicts were read. 960 S.W.2d at 491. This Court found that a mistrial was not warranted because the defendant's appearance in handcuffs was brief, occurred only at the end of the guilt phase, and the defendant was not otherwise restrained during the trial. *Id.* at 491–92.

The only time Taylor was visually hand-cuffed in front of the jury was when he was escorted out of the courtroom after the guilty verdicts were read. The jury had just found Taylor guilty of four counts of first degree murder. Taylor was not prejudiced, and the trial court did not abuse its discretion in denying the mistrial request. Point eleven is denied.

### XII. Proportionality Review

 A proportionality review is statutorily required when a defendant is sentenced to death. This Court is to determine:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and

(2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in subsection 2 of section 565.032 and any other circumstance found;

(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, consider-

ing both the crime, the strength of the evidence and the defendant.

Section 565.035.3.

The record does not support the finding that passion, prejudice or arbitrary factors influenced the death sentence.

 The jury found the same five aggravating factors for each of the four victims, and the evidence supports the finding of each aggravating factor. The first aggravating factor—that the defendant had a serious assaultive conviction—was established by Taylor's two prior convictions for forcible rape. The second, third and fourth aggravating factors—that the defendant committed the crime while engaged in the commission of another unlawful homicide—were established by evidence that Rowe and her three children were murdered together. Finally, the fifth aggravating factor—that the crimes involved depravity of the mind and were "outrageously and wantonly vile, horrible, and inhuman"—was supported by the evidence that Rowe and her three children were shot, killed, and left in their home for more than a week.

The death sentence is neither excessive nor disproportionate. This Court has upheld the death sentence when more than one victim is murdered. *See State v. Anderson,* 79 S.W.3d 420, 446 (Mo. banc 2002); *State v. Christeson,* 50 S.W.3d 251, 273 (Mo. banc 2001); *State v. Smith,* 32 S.W.3d 532, 559 (Mo. banc 2000). A sentence to death has also been upheld when possible witnesses were killed, *see State v. Ringo,* 30 S.W.3d 811, 826 (Mo. banc 2000); *State v. Middleton,* 998 S.W.2d 520, 531 (Mo. banc 1999), as well as when the defendant had an assaultive criminal history. *See State v. Barton,* 240 S.W.3d 693, 711 (Mo. banc 2007); *State v. Parkus,* 753 S.W.2d 881, (Mo. banc 1988).

The imposition of the death penalty meets the statutory requirements.

## XIII. Conclusion

The judgment is affirmed.

All concur.