Gary D. Witt, Judge
Darious Lucas ("Lucas") appeals his conviction of two counts of murder in the first degree and two counts of armed criminal action. Lucas argues that the trial court abused its discretion in sustaining the State's objection to his offer of proof regarding information that another person confessed to the murders. Further, Lucas argues that the trial court erred in sustaining the State's objection to his proposed jury instruction regarding the credibility of the informant testimony and denying his statutory right to a speedy trial. We affirm.
Statement of Facts
James "Creeper" Richardson ("Richardson") was a drug dealer and owner of a tree trimming service. Lucas was also a drug dealer, who bought from and sold drugs to Richardson. On September 18, 2015, Richardson called Kenneth Long ("Long") and asked him to drive him. Long was a high school friend of Richardson who occasionally worked for Richardson's tree service or as Richardson's driver. Long and his girlfriend met Richardson, who was driving his truck, around 11 p.m. in Kingdom City, Missouri. Richardson got into the vehicle Long was driving and the three drove to a residence in Fulton, Missouri. Richardson went inside while Long and his girlfriend remained in the car. After Richardson returned, the three drove back to Kingdom City. Long then got into Richardson's truck, and he and Richardson drove to the Lake of the Woods exit off I-70 near Columbia, Missouri. Long told his girlfriend to drive to the Lake of the Woods exit and wait for *438 them at a gas station located there. Long's girlfriend had Long's cell phone in her possession.
Around midnight, Long called his girlfriend from Richardson's cell phone and told her that he and Richardson had to make a stop. Long's girlfriend called and texted Richardson's cell phone several times after that call but she received no response. She waited for several hours at the gas station, but never had contact with Richardson or Long again.
Cell phone records from September 18, 2015, showed that Lucas called Richardson's cell phone at 10:32 p.m. and the call lasted for 3 minutes and 34 seconds. A call from Richardson's cell phone was then placed to Long's cell phone. Lucas's cell phone completed a voice call to Richardson's phone at 11:11 p.m. Just before midnight, the record showed a call from Lucas's cell phone to Richardson's cell phone and a call from Richardson's cell phone to Lucas's cell phone. A text message was sent to Richardson's cell phone from Lucas's cell phone at midnight on September 19, 2015. Lucas's cell phone and Richardson's cell phone were connected to the same side of the same cell phone tower at 11:57 p.m.
Between 12:02 a.m. and 12:41 a.m., there were no transactions between Lucas's cell phone and any other phone. At 12:26 a.m. Richardson's cell phone received a text message from another person and was connected to a cell phone tower along I-70 in Columbia. Lucas's cell phone was connected to the same tower at 12:42 a.m.
In the early morning hours of September 19, 2015, Lucas and his girlfriend were driving to Ohio. On the way they showed up unannounced at Erin Black's ("Black") residence in Columbia. Lucas left a trash bag with her and told her to throw it away, which Black did the next morning. Black did not look inside the bag. When Lucas returned from Ohio he asked Black if she had disposed of the trash bag.
On September 19, 2015, at 9:40 a.m., a road paving crew found Richardson's body next to his truck north of Columbia. Ten empty .40 caliber shell casings were scattered around the body. Another empty .40 caliber shell casing was found inside the truck under the rear seat. Long's body was found in a grassy area 300 feet from Richardson's body. Neither the keys to Richardson's truck nor any cell phones were found at the scene.
Richardson died from a gunshot wound to the head. The bullet entered the left side of his head just above the ear. Eight or nine bullet fragments were found in his head, brain, and inside his right cheek and sinus area. Long died from a gunshot wound to the chest and abdomen. The bullet entered Long's lower back, went through the right kidney, and below the fifth rib. Bullet fragments struck the liver, right lung, intestines, and pelvis. Other fragments perforated the heart and some fragments had traveled in Long's bloodstream. The medical examiner testified that of the 700 to 800 autopsies he had performed, this was the first case he had seen with this type of dispersed bullet fragments. Both Richardson's and Long's injuries were caused by the same type of .40 caliber G2 RIP ammunition.
On August 27, 2015, approximately three weeks prior to the murders, Lucas's girlfriend purchased .40 caliber G2 RIP ammunition from the only firearms store in Columbia that sold this type of ammunition. This ammunition is uniquely designed to increase the fragmentation of the bullet upon impact to cause more damage to the target. This ammunition was relatively new to the market and more expensive than other .40 caliber ammunition. The only store which sold this ammunition in *439 Columbia had a total of five boxes for sale. Two boxes were sold to repeat customers and one box was sold to Lucas's girlfriend. The other two boxes were not sold until after the murders.
Lucas was indicted in Boone County Circuit Court as a persistent felony offender on two counts of first-degree murder and two counts of armed criminal action related to the shooting deaths of Richardson and Long. While in jail awaiting trial, Lucas was held in the Boone County Jail. In October 2015, Lucas told a cellmate that he had executed a plan to rob his "cousin" of some drugs and kill him. Lucas said he shot the victim with a .40 caliber hand gun with rare, expensive ammunition. Lucas also said he took the victim's cell phones and had turned off his cell phone so he could not be located during the murders.
While being housed in the Department of Corrections (DOC) during October and November 2015, Lucas told a different inmate that he was being investigated for a double murder in Boone County. Lucas said that he had purchased drugs from Richardson that had been "stepped on real bad" and Richardson had not made it right with him. Lucas believed that Richardson was trying to avoid repaying $7,000 he claimed Richardson owed him. This led to Lucas's decision to kill Richardson. Lucas also talked about having his girlfriend purchase .40 caliber "kill" bullets about three weeks before the murder. Lucas described the bullets as expensive. Lucas further described luring Richardson to the site of the shooting by telling him someone wanted to buy a large amount of drugs. He said he turned off his cell phone while he committed the murders. When Richardson arrived, Lucas said he got in Richardson's vehicle, pulled out a gun, and tried to blow Richardson's head off. Lucas said that he used a Glock handgun that had been stolen from a police officer. Lucas said he then told Long that if he cleaned up the blood and wiped the vehicle down, he would not shoot him. Lucas said that Long begged for his life but he shot Long in the back as he attempted to run away.
While executing a search warrant at Lucas's house, police seized a computer. The computer contained a video of Lucas shooting a Glock handgun at a shooting range about three weeks before the murders. About 15 months after the murders, police searching a vehicle during a traffic stop recovered a .40 caliber Glock handgun that had previously been stolen from a highway patrol trooper's vehicle. A firearms examiner testified that the shell casings recovered from the murder scene had been fired from this stolen Glock handgun.
During a search of Lucas's prison cell while at the DOC, the police seized rap lyrics belonging to Lucas. At the top of the page was the word "Drizzle," which was Lucas's nickname. The rap lyrics discussed Lucas shooting two individuals with a Glock.
During a police interview, Lucas stated that he met Richardson once or twice a month, whereas in an earlier interview he had said he met with Richardson once or twice a week. Lucas also agreed that Richardson had sold him bad drugs on occasion. Lucas stated that he had talked to Richardson only twice on September 18, 2015. After being confronted with the cell phone records showing that he had left for Ohio later than he had previously stated, Lucas changed the time he had previously claimed he left for the trip. Lucas admitted that he gave his girlfriend money to buy the special ammunition, and that he had stopped by Black's residence before leaving for Ohio.
Request for Speedy Trial
Lucas filed a request for speedy trial on July 5, 2016. On September 8, 2016, Lucas's *440 case was set for trial on October 18, 2016. The day after the case was set for trial, Lucas's counsel filed a request for a change of judge, which was granted. On October 21, 2016, the newly assigned judge scheduled Lucas's trial to begin on March 1, 2017, and later moved the trial earlier by one day to February 28, 2017.
On February 27, 2017, the day before Lucas's trial date, Lucas's counsel informed the court that a defense witness, Charles Pearl ("Pearl"), was in federal custody and it was unknown when he was going to be released. Lucas's counsel informed the court that Pearl had been served with a subpoena to testify and was an essential witness to the defense. Lucas's counsel also told the court that Lucas had "filed a 180-day writ under UMDDL"[1] and did not "want to waive his speedy trial request." The court found good cause for the continuance based on the unavailability of an essential defense witness. After the parties submitted available trial dates, the court rescheduled the trial for May 2, 2017.
On April 10, 2017, Lucas filed a pro se motion to dismiss the case alleging that on September 20, 2016, he sent to the prosecutor and the court a demand under the UMDDL that his case be tried within 180 days. On April 24, 2017, Lucas's counsel argued the motion to dismiss to the court and requested that the case be dismissed because more than 180 days had passed since Lucas's demand for a speedy trial. The trial court overruled Lucas's motion to dismiss.
Trial and Offer of Proof
Prior to trial, counsel for Pearl informed the parties that Pearl would not testify in the Lucas trial and would assert his rights not to testify under the Fifth Amendment to the United States Constitution. The State filed a pretrial motion in limine to preclude Windy Atterberry ("Atterberry") from testifying. Atterberry would testify that Pearl told her during a phone call that he and a partner were involved in a double homicide. Lucas asserted that Pearl was unavailable to testify based on his anticipated assertion of his right not to incriminate himself under the Fifth Amendment and that Pearl's alleged statement to Atterberry was admissible as a statement against penal interests. The court took the motion with the case.
A jury trial was held May 2-4, 2017. During trial, Lucas called Pearl as a witness outside the presence of the jury to make a record. When asked if he was involved in the shooting of Richardson, Pearl replied "I'll plead the Fifth." Pearl informed the court that if he were called as a witness in front of the jury he would assert his Fifth Amendment rights and refuse to answer questions. Pearl was currently incarcerated on various pending drug offenses.
During Lucas's case-in-chief, Lucas called Atterberry to testify. The State objected. Lucas's counsel stated that he was not going to ask the witness to identify the person who claimed to be involved in the shootings but would only ask her if she received a call from an individual who claimed to have been involved. The State objected to this testimony on hearsay grounds, and the court sustained the State's objection. Lucas later made an offer of proof as to Atterberry's testimony outside of the hearing of the jury.
During the offer of proof Atterberry testified that her boyfriend contacted her and told her that Pearl had purchased a vehicle from an ex-girlfriend. Atterberry's boyfriend was incarcerated and he asked *441 Atterberry to contact Pearl to assist in dealing with the title issues. Atterberry testified that Pearl called her about the title issues sometime around September 22, 2015. During the phone call, Pearl started talking about his involvement in a double homicide with a partner. Atterberry testified that Pearl called again on another day and again talked about the homicide. She set up a meeting with Pearl to try to obtain more information, but a law enforcement officer who she referred to as "my handler"[2] told her not to meet with Pearl alone. Because she could not find anyone to accompany her to a meeting, she did not go. Atterberry testified that she had never met Pearl in person.
The court again sustained the State's objection to this testimony and rejected the offer of proof. The parties then stipulated to the following addition to the offer of proof:
That [Atterberry] contacted her handler at the time and told her handler that Chuck, who ... is Charles Pearl, told her the position of the bodies. But that today she does not recall what the positions of those two bodies were. And that she recalls Chuck telling her that the bodies were located off of a gravel road.
Tr. 889
During the instruction conference, Lucas requested a non-MAI instruction be submitted to the jury that cautioned the jury on the testimony of "an in-custody informant." The instruction read:
INSTRUCTION NO. A
The testimony of an in-custody informant should be viewed with caution and close scrutiny. In evaluating such testimony, you should consider the extent to which it may have been influenced by the receipt of, or expectation of, any benefits from the party calling that witness. This does not mean that you may arbitrarily disregard such testimony, but you should give it the weight to which you find it to be entitled in light of all the evidence of the case.
The court refused the proposed instruction. The jury was given the approved MAI instruction MAI-CR3d 302.01 on the factors that may be considered in determining the credibility of witnesses.
The jury found Lucas guilty on all counts. Lucas was found to be a persistent felony offender and the court sentenced him to life without parole on both counts of first-degree murder and to consecutive sentences of fifty years on each count of armed-criminal action.
On May 26, 2017, Lucas filed a motion for new trial, which was denied by the court. This timely appeal follows.
Discussion
Lucas raises three claims of error on appeal. In Point One, Lucas argues that the trial court abused its discretion in sustaining the State's objection to Lucas's offer of proof regarding the testimony that Pearl confessed to the double homicide because the exclusion of this evidence violated his rights under the Sixth and Fourteenth Amendments since the evidence was exonerating and made under circumstances providing considerable assurances of its reliability. In Point Two, Lucas argues that the trial court erred in sustaining the State's objection to defense counsel's proposed jury instruction regarding the credibility of the "snitch" witnesses because exclusion of this instruction violated Lucas's rights under the Sixth and *442 Fourteenth Amendments since the credibility instruction given to the jury did not guide the jury as to the special credibility concerns unique to incentivized witnesses. In Point Three, Lucas argues that the trial court erred in denying his motion to dismiss and proceeding with trial in violation of Lucas's right to a speedy trial because the trial began more than 180 days after Lucas filed his pro se request and did not consent to defense counsel's motion for a continuance.
Analysis of Point One
Standard of Review
"A trial court has broad discretion to admit or exclude evidence" and such discretion will only be reversed for a clear abuse of discretion. State v. Forrest , 183 S.W.3d 218, 223 (Mo. banc 2006). A trial court abuses its discretion when its ruling "is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration." Id. Further, "in cases concerning the admission or exclusion of evidence, we review for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial." State v. Cofield , 95 S.W.3d 202, 205 (Mo. App. S.D. 2003) (internal quotation omitted). "Trial court error is not prejudicial unless there is a reasonable probability that the trial court's error affected the outcome of the trial." State v. Pickens , 332 S.W.3d 303, 318 (Mo. App. E.D. 2011).
Analysis[3]
Lucas argues in his first point on appeal that the trial court abused its discretion in sustaining the State's objection to Lucas's offer of proof regarding Atterberry's testimony that Pearl confessed to the double homicide because the exclusion of this evidence violated his rights under the Sixth and Fourteenth Amendments since the evidence was exonerating and made under circumstances providing considerable assurances of its reliability. "Evidence that another person had an opportunity or motive for committing the crime for which the defendant is being tried is not admissible without proof that such other person committed some act directly connecting him with the crime." State v. Schaal , 806 S.W.2d 659, 669 (Mo. banc 1991), cert. denied , 502 U.S. 1075, 112 S.Ct. 976, 117 L.Ed.2d 140 (1992) (quoting State v. Easley , 662 S.W.2d 248, 251-52 (Mo. banc 1983) ).
The testimony presented was that Pearl told another person, Atterberry, that he committed a double homicide with a partner. Therefore, the offered testimony is hearsay. Hearsay is "any out-of-court statement that is used to prove the truth of the matter asserted and that depends on the veracity of the statement for its value." State v. Kemp , 212 S.W.3d 135, 146 (Mo. banc 2007). "[A]n out-of-court statement may be admitted pursuant to the constitutionally based hearsay exception in the due process clause." State v. Taylor , 298 S.W.3d 482, 493 (Mo. banc 2009). "This exception applies to hearsay statements that 'both exonerate the accused and are originally made and subsequently offered at trial under circumstances providing considerable assurance of their reliability.' " Id. (quoting State v. Hutchison , 957 S.W.2d 757, 761 (Mo. banc 1997) ). The initial flaw in Lucas's argument is that the *443 statement is not exonerating. The statement attributed to Pearl was that he committed the double homicide with an unnamed partner. Nothing establishes that Lucas was not the unnamed partner involved in the homicide with Pearl. Therefore the statement on its face fails to meet the initial criteria for its admission.
Further, even if the statement could be found to be exonerating of Lucas for the murder, for a hearsay statement of another confessing to the offense which may exonerate the accused to be admitted into evidence at trial, "[t]hree circumstances of reliability have been recognized: '1) each confession is in a very real sense self-incriminatory and unquestionably against interest; 2) each statement was spontaneously made to a close acquaintance shortly after the murder occurred; and 3) the statements are corroborated by other evidence in the case.' " Id. (quoting Hutchison , 957 S.W.2d at 761 ). All three indicia of reliability must be met to allow admission of the hearsay statement into evidence. State v. Anglin , 45 S.W.3d 470, 473 (Mo. App. W.D. 2001).
In this case, Lucas failed to establish that Pearl's statements to Atterberry met all three indicia of reliability. Pearl's statements made to Atterberry were not statements made to a close acquaintance. Atterberry has never seen or even met Pearl in person at any time. Atterberry's only interaction with Pearl consisted of two phone calls related to title issues regarding a car sale between Pearl and Atterberry's boyfriend's ex-girlfriend. Lucas acknowledges in his brief to this Court that Atterberry was not a close acquaintance of Pearl.
Further, the statements attributed to Pearl in this case do not even constitute a confession to this particular homicide. According to Atterberry's testimony, Pearl merely stated that he was involved with a partner in committing a double homicide at some unknown time and place. Pearl did not state when the homicide he was involved in had occurred and it could have been weeks, months or even years prior based on the evidence presented. There was no evidence to establish that Pearl's alleged confession occurred anywhere close in time to the murder he allegedly committed. Pearl did not state where the homicide occurred, except that it was off of a gravel road. The homicide that Pearl was allegedly involved in could have been in another county or even state. The statement that the homicide he committed was off of a gravel road was inconsistent with the homicide in this case which was committed off of a paved road. While Lucas argues that Pearl said the homicide he was involved in occurred in Boone County, Atterberry did not testify to this alleged fact and no facts in the record support this conclusion. Pearl did apparently provide some information regarding the placement of the bodies in the homicide he was involved in, but Atterberry could not recall what that information was and no evidence established that the body position information was consistent or inconsistent with the body placement in the homicide Lucas was charged with committing. There was no corroborating physical evidence to support the alleged confession. Finally, because of the lack of any corroborating physical evidence of Pearl's involvement in this particular homicide, his statements may not even qualify as a statement that is self-incriminatory and unquestionably against interest because, absent proof of a corpus delicti , Pearl's confession could not be used against him if he were charged with the murder. See State v. Madorie , 156 S.W.3d 351, 353-54 (Mo. banc 2005). As stated supra , all three indicia of reliability must be met to support admission of the hearsay confession into evidence. Anglin , 45 S.W.3d at 473. Atterberry's testimony *444 did not meet the requirements for admissibility.
The trial court did not abuse its discretion in refusing to allow the hearsay testimony regarding Pearl's alleged confession as Lucas failed to establish the reliability of the alleged statement. Point One is denied.
Analysis of Point Two
Standard of Review
"The trial court has discretion to submit or refuse a proffered jury instruction." State v. Bush , 372 S.W.3d 65, 69 (Mo. App. W.D. 2012) (citing State v. Durham , 299 S.W.3d 316, 321 (Mo. App. W.D. 2009) ). "Our review is limited to determining whether the trial court abused its discretion. Id.
Analysis
In his second point on appeal, Lucas argues that the trial court erred in sustaining the State's objection to defense counsel's proposed jury instruction regarding the credibility of the "snitch" witnesses. Lucas argues that by not allowing his proposed jury instruction the trial court violated his rights under the Sixth and Fourteenth Amendments because the MAI instruction given to the jury regarding witness credibility did not guide the jury as to the special credibility concerns unique to incentivized witnesses. Lucas notes a few other jurisdictions, such as California, Oklahoma, and Mississippi, provide for special credibility instructions regarding incentivized informant testimony. He argues that Missouri should follow their lead.
It is normal Missouri practice to instruct the jury with a single instruction addressing the principles relevant to determining witness credibility. State v. Mayes , 63 S.W.3d 615, 630 (Mo. banc 2001). The jury was provided with Supreme Court approved jury instruction MAI-CR3d 302.01. Jury Instruction 1 as given by the trial court stated in relevant part:
In determining the believability of a witness and the weight to be given to testimony of the witness, you may take into consideration the witness' manner while testifying; the ability and opportunity of the witness to observe and remember any matter about which testimony is given; any interest, bias, or prejudice the witness may have ; the reasonableness of the witness' testimony considered in the light of all the evidence in the case; and any other matter that has a tendency in reason to prove or disprove the truthfulness of the testimony of the witness.
(emphasis added).
Defense counsel on cross-examination brought out both fellow inmates's motives for lying. During closing argument defense counsel told the jury that the first inmate to testify was facing nine and a half years, which is "a pretty powerful incentive to get up here and say the things that he said" and that "[h]e cannot be believed." Defense counsel also told the jury that the second inmate to testify was "looking at eight years of his life in front of his eyes about being incarcerated" and "[w]e cannot believe him." While Lucas may believe that Missouri should adopt the practices of some other jurisdictions, he has failed to show that the instruction given to the jury in this case was somehow inadequate or that the jury was not adequately instructed. Further, the Missouri Supreme Court has specifically rejected giving a specific instruction on the potential bias of incentivized witnesses and held that MAI-CR3d 302.01 is sufficient to "properly advise[ ] the jury to consider all the circumstances surrounding the testimony of a witness, *445 including any interest the witness may have in testifying." Mayes , 63 S.W.3d at 630. Moreover, Lucas failed to rebut the presumption that the jury followed and understood the instructions as given. State v. Madison , 997 S.W.2d 16, 21 (Mo. banc 1999). Point two is denied.
Analysis of Point Three
Standard of Review
"Whether a criminal case should be dismissed based on the UMDDL is a question of law which the court reviews de novo. " State v. Sharp , 341 S.W.3d 834, 837 (Mo. App. W.D. 2011). "To the extent the application of law is based on the evidence presented, the facts are viewed in the light most favorable to the judgment, with due deference given to the trial court's factual findings." Id.
Analysis
In his third point on appeal, Lucas argues that the trial court erred in denying his motion to dismiss and proceeding with trial in violation of Lucas's constitutional right to a speedy trial because the trial began more than 180 days after Lucas filed his request for a speedy trial and he did not consent to his counsel's motion for a continuance.
In Lucas's pro se motion to dismiss, Lucas relied on the Uniform Mandatory Disposition of Detainers Law (UMDDL), section 217.450-485[4] not on the right to a speedy trial as set forth in either the United States or Missouri Constitutions. Pursuant to section 217.450, "[a]ny person confined in a department correctional facility may request a final disposition of any untried indictment, information or complaint pending in this state on the basis of which a law enforcement agency, prosecuting attorney's office, or circuit attorney's office has delivered a certified copy of a warrant and has requested that a detainer be lodged against him with the facility where the offender is confined." (emphasis added).
For the UMDDL to apply to Lucas's motion for a speedy trial, a detainer needed to be lodged against him. In the record on appeal provided by Lucas to this Court, there is no copy of a detainer or any evidence establishing that a detainer was lodged against him. At oral argument, Lucas acknowledged that there was no detainer anywhere in the record. Lucas bore the initial burden of proving the application of the UMDDL. See State v. Merrick , 219 S.W.3d 281, 285 (Mo. App. S.D. 2007). Lucas failed to meet this burden.
To the extent that Lucas is arguing on appeal that his constitutional right to a speedy trial under the Sixth Amendment was violated, this argument is not preserved for appeal as it was not raised in Lucas's original pro se motion to dismiss nor argued to the court below. A "point raised on appeal must be based upon the same theory ... as preserved in the motion for a new trial." State v. Lewis , 243 S.W.3d 523, 525 (Mo. App. W.D. 2008).
"An issue that is not preserved for appellate review is subject to only plain error review." State v. Kunonga , 490 S.W.3d 746, 760 (Mo. App. W.D. 2016).
"Plain errors affecting substantial rights may be considered in the discretion of the court when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." Rule 29.12(b); Rule 30.20. "Review for plain error involves *446 a two-step process. The first step requires a determination of whether the claim of error 'facially establishes substantial grounds for believing that manifest injustice or miscarriage of justice has resulted.' " State v. Baumruk , 280 S.W.3d 600, 607 (Mo. banc 2009) (quoting State v. Brown , 902 S.W.2d 278, 284 (Mo. banc 1995) ) (internal and other citations omitted). "All prejudicial error, however, is not plain error, and '[p]lain errors are those which are evident, obvious, and clear.' " Baumruk , 280 S.W.3d at 607 (quoting State v. Scurlock , 998 S.W.2d 578, 586 (Mo. App. W.D. 1999) ) (internal citation omitted). "If plain error is found, the court must then proceed to the second step and determine 'whether the claimed error resulted in manifest injustice or a miscarriage of justice.' " Baumruk , 280 S.W.3d at 607-08 (quoting Scurlock , 998 S.W.2d at 586 ).
Id.
"A defendant's right to a speedy trial is founded upon the Sixth Amendment of the United States" and Missouri Constitution Article I, § 18(a). Taylor , 298 S.W.3d at 504. "The United States and Missouri constitutions provide equivalent protection for a defendant's right to a speedy trial." Id. "To assess whether a right has been respected or denied involves a balance of four factors: (1) the length of delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant." Id.
We do not find the court's denial of Lucas's motion to dismiss to be plain error. The trial was delayed by a little over a month from the original trial date, which was originally set at less than 180 days. Although the continuance was requested by Lucas's counsel over Lucas's objection, Lucas's trial counsel argued that the continuance was necessary to attempt to obtain a witness that would possibly provide exculpatory evidence. Even after the court denied Lucas's motion to dismiss, Lucas's counsel again asked for a continuance which was later withdrawn. Had Lucas's counsel failed to request a continuance to attempt to obtain the testimony of Pearl (which Lucas argues above was exculpatory), Lucas would certainly have argued that trial counsel was ineffective in failing to make such a request.
Finding that the court did not plainly err in denying Lucas's motion to dismiss, Point Three is denied.
Conclusion
The trial court's judgment is affirmed.
All concur

Uniform Mandatory Disposition of Detainers Law, Section 217.485 et seq.

It is difficult to determine from the record but it appears that Atterberry was or had been a police informant and this officer was the officer that she had been providing information to regarding other criminal offenses.

In his first point relied on Lucas argues that the court abused its discretion in sustaining the State's objection to Lucas's offer of proof. An offer of proof is required to preserve for appeal the issue of improper exclusion of evidence. State v. Bouser , 17 S.W.3d 130, 141 (Mo. App. W.D. 1991). Therefore, the proper challenge would be to alleged improper exclusion of the evidence, not to challenge the offer of proof. See id.

All statutory references are to RSMo (2000) as amended through January, 2015, unless otherwise indicated.