

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent, | ) | **WD84548** |
| v. | ) | |
| | ) | **OPINION FILED:** |
| | ) | **September 27, 2022** |
| RONNIE DALE SUMMERS, | ) | |
| | ) | |
| Appellant. | ) | |

**Appeal from the Circuit Court of Lafayette County, Missouri
The Honorable Dennis A. Rolf, Judge**

**Before Division One:** Janet Sutton, Presiding Judge, and
Alok Ahuja and Karen King Mitchell, Judges

Ronnie Summers appeals, following a bench trial, his convictions of second-degree assault, § 565.052,[1] resisting arrest, § 575.150, and possession of a controlled substance, § 579.015, for which he was sentenced, as a persistent offender, to concurrent terms of ten years for assault and seven years for resisting arrest and a consecutive term of ten years for possession of a controlled substance for an aggregate sentence of twenty years' imprisonment. Summers raises four points on appeal. In Points I and II, he challenges the sufficiency of the evidence to support his conviction

---

[1] All statutory references are to the Revised Statutes of Missouri, as updated through the 2018 supplement, unless otherwise noted.

of second-degree assault. In Point III, he challenges the sufficiency of the evidence supporting his conviction of resisting arrest. And, in Point IV, he argues that the court erred in refusing to dismiss the charges due to alleged violations of both the Uniform Mandatory Disposition of Detainers Law (UMDDL) and the Sixth Amendment right to a speedy trial. Finding no error, we affirm.

## Background

On February 6, 2020, Officer Andrew Maxwell of the Higginsville Police Department responded to a dispatch at Cypress and 22nd Street, where he observed Summers standing in the street, holding various items. Officer Maxwell, who was in uniform and driving a marked patrol vehicle, approached Summers on foot and explained why he was there. Summers was behaving in a way that suggested to Officer Maxwell that Summers might be under the influence of stimulants. Officer Maxwell knew that Summers was on parole at the time, so Officer Maxwell requested consent to search Summers's person, which Summers granted.

While searching Summers's pockets, Officer Maxwell discovered a small baggie that contained a crystal substance, which Officer Maxwell believed to be methamphetamine. Officer Maxwell returned the substance to Summers's pockets to free up his own hands in order to place Summers under arrest. Officer Maxwell advised Summers to turn around and said he was placing Summers under arrest for possession of a controlled substance. Officer Maxwell then felt Summers pulling away as if to flee; Officer Maxwell advised Summers not to run, but Summers pulled free of Officer Maxwell's grasp and fled south. At the time, Officer Maxwell had a hold of Summers's coat with his left hand, and the force from Summers pulling away caused Officer Maxwell to fall forward, strike his wrist on the ground, and break it.

Sergeant Chris Johnson also responded to the dispatch but arrived shortly after Officer Maxwell. Sergeant Johnson saw Officer Maxwell fall when Summers fled. Officer Maxwell stood

2

back up and pursued Summers on foot, yelling for Summers to stop, and warning Summers that he would release his police dog. Summers eventually stopped running, lay on his back, and waited for Sergeant Johnson to handcuff him. Summers was taken into custody and charged, as a persistent offender, with second-degree assault, resisting arrest, and possession of a controlled substance.

Summers waived his right to a jury and was tried before the court on April 23, 2021. At the trial, the court received testimony from Officer Maxwell and Sergeant Johnson, as well as video footage from Officer Maxwell's body camera. Summers conceded guilt on the possession of a controlled substance count and conceded that Officer Maxwell's broken wrist constituted a serious physical injury. After reviewing the evidence, the court found Summers guilty on all counts.

At sentencing the State outlined Summers's extensive criminal history and sought an aggregate sentence of twenty-four years' imprisonment. Summers's counsel requested a maximum of ten years' imprisonment with all counts to run concurrently. The court sentenced Summers to concurrent terms of ten years' imprisonment for second-degree assault and seven years' imprisonment for resisting arrest, and a consecutive term of ten years' imprisonment for possession of a controlled substance. Summers appeals.

**Analysis**

Summers raises four points on appeal. The first two points challenge the sufficiency of the evidence to support his second-degree assault conviction; specifically, Summers argues that the evidence was insufficient to establish that his conduct was the proximate cause of Officer Maxwell's injury in that (1) the evidence did not show that Summers consciously disregarded a substantial and unjustifiable risk that Officer Maxwell would fall while chasing

3

Summers and (2) the evidence did not show that Summers's actions constituted a gross deviation from the standard of care a reasonable person would exercise in the situation. Summers's third point challenges the sufficiency of the evidence supporting his resisting arrest conviction insofar as he claims the evidence did not support a finding that he used violence or physical force. And, in his final point, Summers argues that the court should have dismissed the charges due to alleged violations of both the UMDDL and the Sixth Amendment right to a speedy trial. For ease of analysis, we address his points out of order.

## I. Summers was not entitled to dismissal of the charges under either the UMDDL or the Sixth Amendment.

"Whether a criminal case should be dismissed based on the UMDDL is a question of law [that] this court reviews *de novo*." *State v. James*, 552 S.W.3d 590, 595 (Mo. App. W.D. 2018) (quoting *State v. Brown*, 377 S.W.3d 619, 621 (Mo. App. W.D. 2012)). Likewise, "[w]hether a defendant's Sixth Amendment right to a speedy trial was violated is also a question of law, which we review *de novo*." *Id.* (citing *State v. Sisco*, 458 S.W.3d 304, 312-13 (Mo. banc 2015)).

### A. Summers failed to properly invoke the protection of the UMDDL.

"The UMDDL provides for the prompt disposition of detainers based on untried state charges pending against a prisoner held within the state's correctional system." *State v. Pugh*, 357 S.W.3d 310, 313 (Mo. App. W.D. 2012) (quoting *Burnes v. State*, 92 S.W.3d 342, 345 (Mo. App. S.D. 2003)); *see* §§ 217.450, 217.460. "The statutory protections of the inmate's right to a speedy trial by allowing dismissal of any charges not prosecuted within 180 days of the request for disposition are triggered by the lodging of the detainer." *State v. James*, 552 S.W.3d 590, 597 (Mo. App. W.D. 2018). A criminal defendant bears the "initial burden of proving the application of the UMDDL." *State v. Lucas*, 559 S.W.3d 434, 445 (Mo. App. W.D. 2018); *see also State v. Merrick*, 219 S.W.3d 281, 285 (Mo. App. S.D. 2007) (holding that defendant bore the burden of

4

proving compliance with the mandatory procedures for invoking the protection of the UMDDL).

Here, the State argues that Summers failed to invoke the protection of the UMDDL by failing to prove the existence of a detainer lodged against him.

"A detainer is 'a request filed by a criminal justice agency with the institution in which a prisoner is incarcerated, asking the institution either to hold the prisoner for the agency or to notify the agency when release of the prisoner is imminent.'" *Pugh*, 357 S.W.3d at 313 (quoting *Burnes*, 92 S.W.3d at 346)). "The purpose of a detainer is to put prison officials on notice that the inmate is wanted to face pending charges in another jurisdiction upon the inmate's release from prison." *Id.* "[T]he mere knowledge by the DOC of pending charges against [an inmate, however, is] insufficient to trigger the UMDDL. Notice of the warrant, by itself, [does] not constitute a detainer." *Greene v. State*, 332 S.W.3d 239, 245 (Mo. App. W.D. 2010).

The record below establishes that Summers first filed a request for disposition of detainers under the UMDDL on April 2, 2020. But nothing in the record reflects that either an actual or a de facto detainer had been lodged against him at that time. Summers subsequently sought dismissal of the charges under the UMDDL on October 16, 2020, but the record was still silent as to the existence of any detainer. The prosecutor filed a writ of habeas corpus *ad prosequendum* on October 26, 2020, and again on both November 5, 2020, and November 13, 2020. But "a prosecutor's filing of a writ of habeas corpus *ad prosequendum* does not, standing alone, constitute the lodging of a detainer sufficient to trigger the provisions of the UMDDL." *State v. Branstetter*, 107 S.W.3d 465, 477 (Mo. App. W.D. 2003).[2]

---

[2] "When coupled with a proper showing of prejudice in some aspect of the prisoner's incarceration (*i.e.*, additional facts and circumstances demonstrating that he has been treated by prison officials as if a formal detainer had been lodged against him, such as being assigned to administrative segregation or being given a higher security level, being declared ineligible for educational, treatment, or rehabilitation programs or parole, etc.), the filing of a writ of habeas corpus *ad prosequendum* may be considered a *de facto* detainer entitling the prisoner to the protections of the UMDDL." *State v. Branstetter*, 107 S.W.3d 465, 477 (Mo. App. W.D. 2003).

In short, Summers failed to properly invoke the protection of the UMDDL below.  Thus, the trial court did not err in refusing to dismiss the charges on that basis.  But, even if Summers had satisfied his burden, the UMDDL does not mandate dismissal unless the offender also establishes that his "*constitutional* right to a speedy trial has been denied."  *James*, 552 S.W.3d at 597 (quoting *State v. McKay*, 411 S.W.3d 295, 302 (Mo. App. E.D. 2013)).  *See also* § 217.460, RSMo ("If the indictment, information or complaint is not brought to trial within the period *and if the court finds that the offender's constitutional right to a speedy trial has been denied*, no court of this state shall have jurisdiction of such indictment, information or complaint . . . ." (emphasis added)).

### B.  Summers failed to establish a Sixth Amendment speedy trial violation.

"To assess whether the constitutional right to a speedy trial has been respected or denied, the Court must balance four factors:  (1) the length of delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant."  *State ex rel. McKee v. Riley*, 240 S.W.3d 720, 729 (Mo. banc 2007).  None of these factors are "either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial."  *Barker v. Wingo*, 407 U.S. 514, 533 (1972).  "Rather, they are related factors and must be considered together with such other circumstances as may be relevant."  *Id*.

The following is a timeline of relevant events in this matter:

2/26/20 – Summers is arrested

3/4/20 – Summers requests a one-week continuance to 3/11/20

3/11/20 – Summers requests a two-week continuance to 3/25/20

3/25/20 – hearing postponed because Summers was in the department of corrections on an unrelated matter

4/2/20 – Summers files a request for speedy trial under the UMDDL

6

4/3/20 – Summers files a second request for speedy trial under the UMDDL

10/16/20 – Summers files a *pro se* motion to dismiss for violation of his rights to speedy trial under the UMDDL and the Sixth Amendment

10/26/20 – Prosecutor files a writ of habeas corpus *ad prosequendum* for DOC to make Summers available for court proceedings

11/4/20 – Summers requests a continuance until 11/30/20

1/19/21 – Summers requests a continuance until 2/1/21

2/1/21 – Summers requests a continuance until 2/16/21

2/16/21 – Due to inclement weather, the matter is continued to 2/18/21

2/18/21 – Summers requests a continuance until 3/1/21

4/23/21 – Summers is tried before the court

"[T]he length of the delay triggers the [Sixth Amendment] analysis:  until there is a delay that is presumptively prejudicial, there is no need to inquire into the other factors." *State v. Howell*, 628 S.W.3d 750, 758 (Mo. App. E.D. 2021).  "In Missouri, a delay of more than eight months is generally considered presumptively prejudicial." *Id.*  "The delay in bringing a defendant to trial is measured from the time of the formal indictment or when actual restraints are imposed by an arrest." *Id*.  "However, 'any delay attributable to the defendant's continuances, motions, or other actions must first be subtracted from the total delay.'" *Id*. (quoting *State v. Allen*, 954 S.W.2d 414, 417 (Mo. App. E.D. 1997)).

Here, Summers was arrested on 2/26/20 and tried on 4/23/21; thus, the overall delay was approximately fourteen months.  After subtracting the 86 days attributable to continuances requested by Summers, the overall delay was approximately eleven months, which is sufficient to trigger a full speedy trial analysis.

"Closely related to length of delay is the reason the government assigns to justify the delay." *Barker*, 407 U.S. at 531. "Here, too, different weights should be assigned to different reasons." *Id.* "A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government." *Id.* "A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." *Id.* "Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay." *Id.*

The record here is less than clear as to the reasons for various delays. There was a single two-day delay attributable to inclement weather in February 2021, but the record is otherwise silent as to gaps in time other than those attributable to Summers's requested continuances. We note that the largest time gap (seven months) appears between March and October of 2020; and during that time, both State and National emergencies were declared as a result of the COVID-19 pandemic. "Although 'even in a pandemic, the [c]onstitution cannot be put away and forgotten[,]' an overwhelming majority of courts have concluded good cause existed to excuse delays resulting from the COVID-19 pandemic." *State v. Correa*, KNL-CR180135304-T, 2022 WL 2132913, *2 (Conn. Super. Ct. June 14, 2022) (quoting *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 68 (2020)) (collecting cases). And, because pandemic-related delay is beyond government control, other jurisdictions expressly hold that delay due to COVID-19 does not weigh against the state in a speedy trial analysis. *See, e.g., State v. Paige*, 977 N.W.2d 829, 840 (Minn. 2022) ("As the emergency prompting the COVID-19 orders was an external factor outside of the court's control, we conclude that the second *Barker* factor does not weigh against the State.").

In any event, there is nothing in the record reflecting either a "deliberate attempt to delay the trial in order to hamper the defense" or "negligence or overcrowded courts"—the two greatest concerns expressed by the United States Supreme Court in *Barker*. Accordingly, we find this factor to be neutral in the analysis.

"The third factor to be considered is whether and how the defendant asserted his right to a speedy trial." *Sisco*, 458 S.W.3d at 316. "There is no rigid requirement regarding when a defendant must assert his right to a speedy trial." *Id*. "Instead, courts will weigh the timeliness of the assertion and the frequency and force of a defendant's objections." *Id*.

Here, Summers arguably asserted his right three times by motion (the two motions filed under the UMDDL and the motion to dismiss filed on 10/26/20)[3] and renewed it once orally at his preliminary hearing on 11/30/20. Yet the bulk of his continuance requests occurred *after* the renewed motion to dismiss at the preliminary hearing. These actions "contradict his present claim that his right to a speedy trial was violated." *State v. Harris*, 673 S.W.2d 490, 494 (Mo. App. E.D. 1984). Thus, this factor weighs against Summers.

As to the final factor, "[w]hether defendant was prejudiced by any delay in going to trial is the most important factor in the speedy trial analysis." *State v. Williams*, 34 S.W.3d 440, 447 (Mo. App. S.D. 2001). "To require reversal, any claimed prejudice resulting from delay must be actual prejudice apparent on the record or by reasonable inference." *Id*. (quoting *State v. Darnell*, 858 S.W.2d 739, 746 (Mo. App. W.D. 1993)). Prejudice generally consists of oppressive pretrial incarceration, anxiety and concern of the accused, and/or impairment of the defense. *Barker*, 407 U.S. at 532.

---

[3] The UMDDL motions did not invoke Summers's constitutional right to speedy trial, but we note them nonetheless because a UMDDL violation, under certain circumstances, might also support a speedy trial violation under the Sixth Amendment. *See Eckert v. State*, 633 S.W.3d 435, 445 (Mo. App. W.D. 2021).

Summers first argues that he was subjected to oppressive pretrial incarceration and anxiety and concern. But Summers was incarcerated in DOC on an unrelated matter for all but twenty days of the time between his arrest and trial. Where a defendant is "incarcerated on other charges in addition to the present charges, he cannot show oppressiveness of pretrial incarceration." *State v. Young*, 582 S.W.3d 84, 95 (Mo. App. E.D. 2019). Furthermore, it is the defendant's burden to establish prejudice from pretrial delay. *State v. Howell*, 628 S.W.3d 750, 759 (Mo. App. E.D. 2021). And "anxiety and concern exist in every criminal case, but that alone does not establish prejudice where, as here, the defendant neither asserts nor shows that the delay weighed particularly heavily on him in specific instances." *Myszka v. State*, 16 S.W.3d 652, 659 (Mo. App. W.D. 2000) (quoting *State v. Woodworth*, 941 S.W.2d 679, 694 (Mo. App. W.D. 1997)).

With respect to an impaired defense, Summers's brief argues only that "[t]he factual matters [Summers] set forth in his motion to dismiss identified how his defense was impaired." But there are no factual allegations of prejudice contained within Summers's motion to dismiss. And we see no obvious prejudice. There were three people involved in the underlying case: Officer Maxwell, Sergeant Johnson, and Summers. Both law-enforcement officers testified at Summers's trial, and Summers chose not to. The court also received video footage of the incident from Officer Maxwell's body cam, and Summers stipulated to the medical records establishing the existence and seriousness of Officer Maxwell's injury. It does not appear that any witnesses or evidence became unavailable as a result of the delay. In the absence of any discernable prejudice, this factor weighs against Summers.

10

In sum, though the length of the delay was presumptively prejudicial such that it triggered the full speedy trial analysis, none of the remaining factors weigh in favor of finding a violation. Accordingly, Point IV is denied.[4]

**II.      The evidence was sufficient to support Summers's convictions.**

In Summers's remaining points, he challenges the sufficiency of the evidence to support his second-degree assault and resisting arrest convictions. "When reviewing the sufficiency of the evidence, the standard of review on appeal from a bench-tried case is the same as the standard used on appeal of a case tried to a jury." *State v. Morris*, 640 S.W.3d 762, 765 (Mo. App. W.D. 2022) (quoting *State v. Glaze*, 611 S.W.3d 789, 794 (Mo. App. W.D. 2020)). "In reviewing the sufficiency of the evidence, we do not reweigh the evidence, and the test is not whether we believe the evidence established the defendant's guilt beyond a reasonable doubt." *Id.* (quoting *Glaze*, 611 S.W.3d at 794). "Instead, we view the evidence in the light most favorable to the verdict, disregarding all contrary evidence and reasonable inferences, in order to determine whether any rational fact-finder could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 765-66 (quoting *Glaze*, 611 S.W.3d at 794)).

**A. The evidence supported Summers's conviction for second-degree assault.**

In his first two points, Summers argues that the evidence was insufficient to support his conviction for second-degree assault insofar as the evidence failed to establish that Summers's conduct proximately caused Officer Maxwell's injury. Summers further argues that the evidence

---

[4] After the State raised the argument in its appellate brief that Summers failed to establish the existence of a detainer and therefore his claim that the case should be dismissed based on the UMDDL failed, Summers sought and received a document from the department of corrections that appears to be a detainer lodged against him in favor of Lafayette County on the underlying charges. Summers filed a motion with this court asking to supplement the record on appeal to include this document. That motion was taken with the case. As noted above, the UMDDL does not mandate dismissal unless the offender also establishes that his constitutional right to a speedy trial has been denied. Because we conclude Summers did not establish a violation of his constitutional right to a speedy trial and thus that even if he had carried his burden to prove that the UMDDL applied his Point IV would be denied, Summers's motion to supplement the record on appeal is denied as moot.

11

did not establish that he acted recklessly insofar as it failed to show both that he consciously disregarded a substantial and unjustifiable risk and that his conduct constituted a gross deviation from the standard of care a reasonable person would exercise in similar circumstances. We disagree.

"A person commits the offense of assault in the second degree if he . . . [r]ecklessly causes serious physical injury to another person . . . ." § 565.052.1(3). "A defendant is criminally responsible for assault in the second degree by whatever means it was accomplished, provided the resultant injury was proximately caused by his unlawful act." *State v. Toran*, 878 S.W.2d 913, 914 (Mo. App. E.D. 1994). "Thus, with crimes—such as [second-degree assault]—defined to require not merely conduct, but also a specified result of such conduct, the defendant's conduct must be the legal, or proximate, cause of the result." *State v. Burton*, 370 S.W.3d 926, 931 (Mo. App. E.D. 2012). In other words, "[t]he defendant's conduct must constitute the cause in fact of the result—but for the defendant's conduct, the result would not have occurred." *Id*. "And any variation between the result hazarded by the defendant's reckless conduct and the result actually achieved must not be so extraordinary that it would be unfair to hold the defendant responsible for the actual result." *Id*. Where a defendant flees from a lawful stop, is pursued by an officer, and the officer sustains a foreseeable injury during the ensuing chase, the defendant's conduct is both the actual and proximate cause of the officer's injuries. *Id*.

Here, the State charged Summers with recklessly causing serious physical injury to Officer Maxwell "by pulling away from [Officer] Maxwell and causing [Officer] Maxwell to fall and break a bone." When Officer Maxwell was attempting to handcuff Summers, Officer Maxwell had a hold of Summers's coat; so, when Summers fled, Officer Maxwell was pulled in the same direction. This force pulled Officer Maxwell off balance, causing him to fall unexpectedly and

land on his wrist on the concrete street where they had been standing.[5]  The fall broke Officer

Maxwell's wrist.  Thus, Summers's conduct of pulling away in the process of fleeing was the

actual cause of Officer Maxwell's injury.  It was also the proximate cause insofar as it is reasonably

foreseeable that suddenly pulling away from a person's grasp could cause the person to fall and

that a person who unexpectedly falls onto a concrete surface will sustain injury, potentially

including a broken bone.[6]    Thus, Summers's conduct was the proximate cause of

Officer Maxwell's injury.

Summers's conduct was also reckless.  A person acts "recklessly" when he "consciously

disregard[s] a substantial and unjustifiable risk that circumstances exist or that a result will follow,

and such disregard constitutes a gross deviation from the standard of care which a reasonable

person would exercise in the situation."  § 556.061(42).

Fleeing a lawful stop by a law-enforcement officer demonstrates a conscious disregard of

a substantial and unjustifiable risk of physical injury to the officer, grossly deviates from the

standard of care that a reasonable person would exercise, and is thereby reckless.  *Burton*, 370

S.W.3d at 928.  In *Burton*, a highway patrol trooper observed the defendant riding his motorcycle

without a helmet and attempted to pull the defendant over.  *Id*.  The defendant pulled into a

driveway but then left the driveway and continued to ride down a hill through the grass.  *Id*.  The

defendant lost control of the motorcycle when he hit a patch of mud and was thrown from the

motorcycle.  *Id*.  Rather than stop, the defendant continued to flee on foot with the trooper in

pursuit.  *Id*.  When the trooper came within an arm's length of the defendant, the trooper leaped

out to grab the defendant, but the defendant slipped and fell, causing the trooper to do the same.

---

[5] Contrary to Summers's argument, the evidence did *not* show that Officer Maxwell fell while running after Summers; it showed that Officer Maxwell fell because he was holding onto Summers when Summers suddenly pulled away.

[6] Summers conceded that the broken wrist constituted a serious physical injury.

13

*Id*. The trooper "landed face first into the bottom rung of [a] fence . . . [and] suffered a broken nose and a cut to his upper lip." *Id*.

The defendant was charged with and convicted of recklessly causing physical injury to a law-enforcement officer; on appeal, he challenged the sufficiency of the evidence to support the court's determination that he acted recklessly. *Id*. at 929. The Eastern District of this court determined that "[f]light from an officer effecting a legal stop inherently includes a substantial and unjustifiable risk of physical injury to the officer." *Id*. at 930. And "[a] reasonable person would not disregard this risk." *Id*. By doing so, "the defendant's disregard constituted a gross deviation from the standard of care that a reasonable person would exercise." *Id*.

The same is true here. Summers's effort to flee from Officer Maxwell inherently included a substantial and unjustifiable risk of serious physical injury to Officer Maxwell that a reasonable person would not disregard. Therefore, it was reckless.[7]

Summers attempts to distinguish *Burton* by pointing out that the fields through which the trooper pursued Burton were slick and muddy, whereas Summers and Officer Maxwell were on a concrete street. But the surface conditions in *Burton* were relevant to the court's determination of proximate cause and not its determination of recklessness.[8] *See id*. at 931 ("[T]he defendant should have reasonably foreseen that the trooper might fall and suffer injury while pursuing him . . .

---

[7] Though the *Burton* court was evaluating recklessness resulting in mere physical injury rather than serious physical injury, we do not believe the result would have differed, as in both cases the resulting injury included a broken bone. Serious physical injury is "physical injury that creates a substantial risk of death or that causes serious disfigurement or protracted loss or impairment of the function of any part of the body." § 556.061(44). Our courts frequently hold that broken bones constitute serious physical injuries. *See, e.g., State v. Briggs*, 740 S.W.2d 399, 401 (Mo. App. E.D. 1987) (cracked rib); *State v. Mentola*, 691 S.W.2d 420, 422 (Mo. App. S.D. 1985) (broken jaw); *State v. Emory*, 643 S.W.2d 24, 27 (Mo. App. E.D. 1982) (broken arm). The only reason the *Burton* court was analyzing a mere physical injury rather than a serious physical injury was because of the manner in which the prosecution chose to charge the crime.

[8] This distinction might make a difference in our proximate cause analysis *if* the evidence were as Summers suggests—that Officer Maxwell fell while running, rather than upon being suddenly pulled off-balance—but surface conditions had no effect on Officer Maxwell's fall; it was entirely the result of Summers's act of suddenly jerking away from Officer Maxwell, pulling him off balance.

[insofar as] [h]is flight from the trooper across a wet, muddy field and across three fences created a risk of injury to the trooper that materialized."). As to recklessness, the court held that "a substantial and unjustifiable risk of physical injury is inherent in *any* flight from a lawful stop by law enforcement." *Id*. at 930 (emphasis added).

Accordingly, Points I and II are denied.

## B. The evidence supported Summers's conviction for resisting arrest.

In his third point, Summers argues that the evidence was insufficient to support his resisting arrest conviction insofar as it failed to establish that he either used or threatened to use physical force or violence. We disagree.

> A person commits the offense of resisting . . . arrest . . . if he . . . knows or reasonably should know that a law enforcement officer is making an arrest . . . , and for the purpose of preventing the officer from effecting the arrest, . . . he . . . [r]esists the arrest . . . by using or threatening the use of violence or physical force . . . .

§ 575.150.1(1). Summers does not challenge the facts that Officer Maxwell was a law-enforcement officer, that Summers knew that Officer Maxwell was a law-enforcement officer, that Summers knew Officer Maxwell was attempting an arrest, or that Summers resisted. His sole challenge is that evidence was insufficient to establish that Summers used or threatened to use violence or physical force to do so.

Much of Summers's argument is focused on the idea that he did not make threats or use "violence" against Officer Maxwell. While this is true, making threats and using violence are not the only ways in which a person can commit the crime of resisting arrest. *State v. Caldwell*, 352 S.W.3d 378, 383-84 (Mo. App. W.D. 2011) ("Under section 575.150.1, resisting arrest is a crime if the person being arrested resists by one of five separate means: 'using violence, threatening to use violence, using physical force, threatening to use physical force, or by fleeing.'" (quoting *State v. Belton*, 108 S.W.3d 171, 175 (Mo. App. W.D. 2003)). And, "[b]y separately listing 'violence'

15

and 'physical force,' the legislature obviously intended for 'physical force' to include nonviolent force. To conclude otherwise would render 'physical force' mere surplusage." *Belton*, 108 S.W.3d at 175.

"[T]he General Assembly did not define 'physical force' in § 575.150.1." *Id.* "When a term is not defined by statute, [we] will give the term its 'plain and ordinary meaning as derived from the dictionary.'" *State v. Smith*, 595 S.W.3d 143, 146 (Mo. banc 2020) (quoting *Mo. Pub. Serv. Comm'n v. Union Elec. Co.*, 552 S.W.3d 532, 541 (Mo. banc 2018)). "Force" is "[p]ower, violence, or pressure directed against a person or thing." FORCE, Black's Law Dictionary (11th ed. 2019). "Physical force" is "[f]orce consisting in a physical act." *Id.* "[T]he 'physical force' necessary for a conviction under section 575.150.1(1) include[s] nonviolent *force* in the form of the defendant's *physical resistance* to the officer's attempts to [control the defendant]." *Caldwell*, 352 S.W.3d at 384.

Here, Summers engaged in a physical act—pulling away from Officer Maxwell's grip— and, in doing so, exerted pressure against both Officer Maxwell's grip and Summers's own coat. Thus, he engaged in physical force. *See State v. Reynolds*, 723 S.W.2d 400, 404 (Mo. App. W.D. 1986) (holding that there was sufficient evidence of physical force where the defendant "drew his arm back after [the officer] had hold of it, and upon being told to place his hands on the wall he yanked his away and then [the officer] was [inadvertently] struck across the face"); *State v. Shipp*, 125 S.W.3d 358, 360-61 (Mo. App. S.D. 2004) (holding there was sufficient evidence of physical force where the defendant, while being handcuffed, "pulled his hand away, fought against [the officer], and continued to struggle to get away").

Accordingly, Point III is denied.

16

**Conclusion**

Summers failed to establish violations of either the UMDDL or the Sixth Amendment right to speedy trial, and the evidence supporting his convictions was sufficient. Thus, his convictions and sentences are affirmed.

Karen King Mitchell, Judge

Janet Sutton, Presiding Judge, and Alok Ahuja, Judge, concur.

17